**Alfred B. LEAVITT and G. P. Decker, Appellants,**

v.

**James Allen SCOTT, by and through his Guardian ad Litem Irma Lee Scott, Appellee.**

**No. 7676.**

United States Court of Appeals Tenth Circuit.

Nov. 4, 1964.

Rehearing Denied Dec. 16, 1964.

**750**

William K. Ris, Denver, Colo., and Don J. Hanson, Salt Lake City, Utah (Edward M. Garrett, Salt Lake City, Utah, on the brief), for appellants.

Dwight L. King, Salt Lake City, Utah (Gayle Dean Hunt, Salt Lake City, Utah, on the brief), for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

This is a diversity action in which appellee, plaintiff below, was awarded a judgment totalling $93,489.40 for special and general damages found by a jury to have been suffered by him as the result of an automobile accident occurring upon a Utah highway. The determination of amount of damage was the only issue submitted to the jury, the trial court having directed a verdict upon liability. The appellants-defendants raise no appellate question concerning liability and direct their claims of error to the subjects of the jurisdiction of the trial court, the amount of the verdict, the instructions of the court on damages, and the rulings of the court affecting the scope of examination, particularly cross-examination of expert medical witnesses. Since each of appellants' contentions, including that attacking jurisdiction, is interwoven in the factual background of Mr. Scott's injuries, it is necessary to narrate that background in some detail.

Scott was injured in a head-on collision of two trucks. He suffered multiple injuries, the most severe of which was a cerebral concussion which rendered him totally unconscious for a period of three days and comatose for an additional five days. He was hospitalized for seventeen days and released to go back to work six weeks thereafter on May 12, 1962.

Before the accident, Scott had been employed as a truck driver and operator of a front end loader. He was described by his employer and by fellow employees as a skillful and generally superior employee and had been earning about $600 a month. Upon his return to employment his work proved unsatisfactory and his employer, after consulting with Scott's personal physician, let him go. Scott's difficulty lay in forgetfulness, unsureness and a noticeable inability to follow directions. He was considered a hazard to his own safety and to that of his fellow employees.

Between his period of hospitalization and the time of trial, Scott was examined for the purpose of diagnosis or treatment by four physicians including specialists in the field of neurology, neuro-surgery and neuro-psychiatry. Each testified at the trial by appearance or deposition and each stated that Scott was physically able and that all standard neurological tests, such as an electroencephalogram, were negative. Each agreed that no residual brain damage was demonstrable through such tests and that the tests were of such reliability that the existence of organic brain injury not demonstrable by the tests was at least uncommon. However, plaintiff's medical witnesses gave positive expert opinions that Scott was suffering from a brain injury attributable to his concussion that rendered him 50 to 100 per cent permanently disabled. Defendants' expert did not express a contrary opinion as to the existence of organic injury but indicated that the negative results of neurological tests would

lead him to consider the possibility of a purely psychological or emotional disturbance. No positive opinion was asked for or given and this medical witness indicated he was not qualified to and did not test for purely psychological disturbance. Psychometric tests were given by plaintiff's witness, Dr. Troy, who found Scott's ability to think greatly impaired and attributed the condition to a brain injury. No treatment was indicated or recommended by any of the medical witnesses at the time of trial.

At the time of Scott's accident, March 6, 1962, he owned a home at Moab, Utah, in which he resided with his wife and children. After his attempt and failure to return to and perform his original employment he was advised by his doctor, as a therapeutic measure, to seek outdoor work of an undemanding nature requiring a minimum of responsibility. In August of 1962 he obtained a job as a hand upon a Colorado ranch and in September the entire Scott family moved to Collbran, Colorado. The change of locale and the simplicity of work did not benefit Scott's condition, his mental perplexity and lack of memory persisted, and in October, 1963, the family moved back to Moab, Utah.

■ The defendant Leavitt is a citizen of Utah. At the time of the accident and at the time of trial the plaintiff was a citizen of Utah. This action was commenced January 25, 1963, at which time the plaintiff was residing in Colorado. The trial court specifically and specially found that in January of 1963 Scott was a citizen of Colorado and that the required diversity of citizenship conferred jurisdiction upon the court. We find the evidence to be substantial when considered in its most favorable aspect in support of the finding and consequently that the finding is not clearly erroneous. Rule 52(a), Fed.R.Civ.P. The motive of the family move to Colorado is not disputed—it was made upon medical advice for the potential benefit of Mr. Scott's health. The evidence indicates an intent for permanent change, dependent, of course, upon Mr. Scott's

condition. The family belongings were moved; the children were enrolled in Colorado schools; Mrs. Scott entered into community and church activities in Collbran; and the Moab home was leased upon a yearly basis. Mrs. Scott testified that the Moab property was not sold outright because a continuing income was necessary for the family. Although the roots of the Scott family were undoubtedly in Utah and both Mr. and Mrs. Scott frankly entertained the hope that they could one day return to their home in Moab, the move to Colorado was still made with the then present intent of remaining and establishing a Colorado residence. Such is sufficient to establish citizenship within the requirements of 28 U.S.C. § 1332. Mid-Continental Pipe Line Co. v. Whiteley, 10 Cir., 116 F.2d 871. Since jurisdiction, once established, is not lost by a change in citizenship, Smith v. Sperling, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205, the trial court correctly found jurisdiction to exist.

■ The determination of the extent or limitation upon examination or cross-examination of witnesses is a matter of discretion with the trial court and a technique so necessary for the proper control of a trial and so peculiarly suited for the judgment of the trial court that upon review that court's rulings will not be upset except for a clear and prejudicial abuse of discretion. We do, however, agree with appellants' suggestion that in the instant case the nature and extent of Scott's claimed injury, being both severe and "uncommon," dictates the right to a wide latitude in examination, particularly cross-examination, of the medical witnesses. Consequently, we have examined the record with an exacting eye in regard to each ruling and incident pointed to by appellants as constituting an unreasonable limitation upon counsel's right to examine. Our review, tempered by the counter-rule that wide latitude of examination does not include promiscuous exploration or the insertion of suggested facts that do not exist, convinces us that the trial court did not abuse its discre-

tion in such regard. For example, the trial court twice refused defendants' counsel the privilege of examining the earlier witnesses concerning other accidents involving Scott that had occurred prior to the subject accident. Ruling the inquiries to be immaterial, the court invited counsel to make an offer of proof under Rule 43(c), Fed.R.Civ.P. No offer was made. And although later in the trial Scott testified upon cross-examination that he had been hit in the head by a rifle butt during World War II (without permanent effect), had been in a motorcycle accident, and had hurt his ankle in an industrial accident, the materiality of these incidents never appeared. The court also ruled out questions proposed by defendants' counsel to expert witnesses which were premised in part by the assumption that Scott's symptoms were existent to some degree prior to the subject accident. Except for some testimony that Scott was a quiet and withdrawn man both before and after his accident, there was no evidence or offer of evidence that his mental perplexity pre-existed the accident, and we find no error in the court's ruling in this regard or in any other ruling upon the subject.[1]

Appellants' contentions regarding error in the court's instructions are generalized against overemphasis rather than specific error. Since the only issue submitted to the jury was that of damages, and the only evidence in the record concerning damages that needed detailed instruction pertained to charts of life expectancy and earning power, it was inherent in the case that such subjects dominate the instructions. We find no error in the instructions nor unfair dominance of subject matter.

Appellants' final contention that the verdict is excessive is without merit.

The evidence is overwhelming that Scott suffered a severe and permanent injury that destroyed all or part of his earning capacity for his life expectancy of 31.6 years. The award of $92,000 general damage does not in any way indicate that an improper cause motivated the jury's determination of the monetary fact of damage, absent which the finding is considered inviolate. Barnes v. Smith, 10 Cir., 305 F.2d 226, 228.

The judgment is affirmed.

---

1. Counsel's complaint regarding the scope of examination is perhaps not directed against the substance of the trial court's rulings so much as it is against the manner of such rulings. The trial court exhibited flurries of impatience at defendants' counsel's persistence in obtaining definitions from the medical witnesses upon such terms as "functional" disorder. The court also complained to plaintiff's and defendants' counsel about the reading of a deposition that the court thought to be too long. We do not find such incidents to have had noticeable impact upon the conduct of the trial.