Ellen HAWES, for herself and in Representation of the minors Ana Francisca Hawes and Maria Cristina Hawes, Plaintiffs-Appellants,

v.

CLUB ECUESTRE EL COMANDANTE et al., Defendants-Appellees.

No. 78-1387.

United States Court of Appeals, First Circuit.

Argued Feb. 6, 1979.

Decided May 18, 1979.

Eleanor Jackson Piel, New York City, for plaintiffs-appellants.

Antonio Gnocchi Franco, Santurce, P. R., with whom Amancio Arias Cestero, and Amancio Arias Guardiola, Santurce, P. R., were on brief, for Club Ecuestre El Comandante, et al., defendants-appellees.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, JAMESON, District Judge.*

BOWNES, Circuit Judge.

Plaintiffs-appellants appeal the dismissal of their tort action for lack of diversity citizenship. 28 U.S.C. § 1332(a)(1), Fed.R. Civ.P. 12(b)(1). On April 17, 1974, John Hawes[1] and Ellen Hawes, husband and wife, alleging citizenship in New York, brought suit against the defendants, including four equestrian clubs and federations, the municipality of San Juan, Puerto Rico, an insurance company and thirty-eight individual defendants, for injuries incurred by John Hawes.

The issue is whether John and Ellen Hawes were domiciled in New York or, as the district court found, in Puerto Rico at the time the lawsuit was commenced.

■ The district court, as was within its discretion, determined the question of jurisdiction on answers to interrogatories, deposition statements and an affidavit of Ellen Hawes without holding a hearing. *Gibbs v. Buck*, 307 U.S. 66, 71–72, 59 S.Ct. 725, 33 L.Ed. 1111 (1939); 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3612 at 726–27 (1975).

As is usual in domicile cases, there is no dispute as to the facts; it is their interpretation that gives rise to the problem. Although it is clear that John and Ellen Hawes were domiciled in Puerto Rico from 1949 until May 26, 1973, when they left for New York, the salient facts of their Puerto Rican residency are a necessary factor in the domicile question. After coming to Puerto Rico in 1949, the Haweses acquired a ten "cuerdos" farm in Cidra, which is near the center of the Island, where they kept horses and spent their weekends. On the date of the accident, which fostered this suit, the Haweses resided in an apartment at the faculty residence of the University of Puerto Rico. Ellen Hawes had been employed by the University for almost twenty years; initially, she worked in the registrar's office and later was a special assignment officer in the office of the president. John Hawes was a self-employed artist specializing in calligraphy. He also taught part-time at the University and worked as a salaried employee for a private corporation.

The accident, which changed John Hawes from a normal man into a hopeless cripple,

---

* Of the District of Montana, sitting by designation.

1. John Hawes died on June 29, 1975. The present plaintiffs-appellants are his widow and their two daughters, Ana Francisca Hawes and Maria Cristina Hawes.

occurred on April 17, 1973. John and Ellen Hawes were attending a horse show at the Hiram Bithorn Stadium sponsored by defendant Club Ecuestre El Comandante and others in which their older daughter, Ana Francisca, was to compete in the jumping event. During one of the competitions, a horse jumped over the wooden barriers separating spectators from contestants and struck Hawes in the back with both front legs. He was taken to the Municipal Hospital and placed in the intensive care unit where he remained for six weeks as a complete quadriplegic. Since Hawes showed no improvement during the six week period, the doctors informed his wife that his only chance for improvement was treatment in a rehabilitation center. Because none was available in Puerto Rico, the Institute for Rehabilitation Medicine of New York University located in New York City was chosen. This choice was influenced by the fact that Mrs. Hawes originally came from Brooklyn and she and her husband had lived in New York City after their marriage prior to moving to Puerto Rico. She, therefore, had friends and relatives in New York.

On May 26, 1973, John Hawes entered Mount Sinai Hospital in New York preparatory to being admitted to the Institute for Rehabilitation Medicine. Ellen Hawes and her younger daughter, Maria, came to New York on the same day.[2] Mrs. Hawes took with them only their personal belongings, leaving her furniture in Puerto Rico with a friend. Residence was obtained in an apartment on 9th Avenue. After arriving in New York City, Mrs. Hawes closed her bank accounts in Puerto Rico and opened a new one in Manhattan. She obtained a New York driver's license. Maria, the younger daughter, was withdrawn from school in Puerto Rico and enrolled in school in New York City. The older daughter, Ana Francisca, who was eighteen, remained in Puerto Rico. She dropped out of school, worked for a year in Puerto Rico, and then moved to Florida. For a time, Mrs. Hawes was able to do some work for the Universi-

ty of Puerto Rico, but then decided to take annual sick leave. After this, she was granted leave without pay on a year-to-year basis. This was done so she could retain her accumulated retirement benefits and qualify for retirement at the age of fifty-eight. Her retirement eligibility date was June 30, 1978.

By September or October of 1973, it became clear that John Hawes would require round the clock institutional care for the rest of his life. Since she could not afford the cost of the Institute for Rehabilitation Medicine and since it did not keep patients who were hopeless, Mrs. Hawes began to look for another less expensive hospital. Her younger daughter became emotionally upset and required psychiatric care. This necessitated treatment in New Canaan, Connecticut, and also changing schools from New York City to Connecticut. Mrs. Hawes maintained her apartment in New York City and also rented a house in Weston, Connecticut, in the latter part of 1973 so as to be near her daughter. She worked part-time in 1973 and part of 1974 at a furniture store in Westport, Connecticut, and commuted to New York three or four times a week to see her husband.

On April 17, 1974, John and Ellen Hawes filed suit in the District Court of Puerto Rico claiming New York citizenship. He was still at the Institute. The facts subsequent to the filing of the lawsuit are also important. Ellen Hawes filed federal income taxes from New York City in 1974 and 1975. She filed and paid a New York state income tax in 1975, but filed no return in 1974 because her income was less than $4,000. Mrs. Hawes did not vote in New York City. The record is silent as to her voting habits in Puerto Rico. In August, 1974, John Hawes was transferred to a less expensive rehabilitation center in Guadalajara, Mexico, where he remained until his death in June of 1975. Mrs. Hawes remained in New York City, since she was unable to obtain adequate employment in

---

2. Most of the facts relative to the New York residency comes from the affidavit of Mrs. Hawes, which is uncontradicted.

Mexico. Sometime in the summer or fall of 1974, she obtained a full time job with New York Magazine, which had its offices in Manhattan, and moved back to her New York apartment.

In the spring of 1975, Mrs. Hawes was contacted by the University of Puerto Rico Press and accepted its offer to become its travelling editor. This job was particularly attractive because it allowed her to complete her retirement requirements with the University. She started work in this capacity on September 1, 1975. Her job required travel through the United States to communities with concentrations of Hispanic population. After about a year in this capacity, she returned to Puerto Rico and continued to work for the University until her retirement on June 30, 1978. On her return, she occupied the same apartment on the University campus that she and her husband had lived in up to the accident.[3]

On the basis of these facts, the district court found "that plaintiffs failed to show their intention to abandon their old domicile in Puerto Rico and acquire a new one in New York City." We reverse.

The basic law as to domicile has been well recognized for many years. Mr. Justice Holmes defined domicile pragmatically: "The very meaning of domicil is the technically pre-eminent headquarters that every person is compelled to have in order that certain rights and duties that have been attached to it by the law may be determined." *Williamson v. Osenton,* 232 U.S. 619, 625, 34 S.Ct. 442, 443, 58 L.Ed. 758 (1914).

"Now, it is elementary that, to effect a change of one's legal domicil, two things are indispensable: First, residence in a new domicil; and second, the intention to remain there." *Sun Printing & Publishing Association v. Edwards,* 194 U.S. 377, 383,

24 S.Ct. 696, 48 L.Ed. 1027 (1904). There must be an intention to remain at the new residence indefinitely; it is not required that the intention be to stay there permanently. A "floating intention" to return to a former domicile does not prevent the acquisition of a new domicile. *Gilbert v. David,* 235 U.S. 561, 569, 35 S.Ct. 164, 59 L.Ed. 360 (1915).

"To acquire a domicile of choice in a place, a person must intend to make that place his home for the time at least." Restatement 2d, Conflict of Laws § 18 (1971). There is no minimum period of residency required. A citizen of the United States can instantly transfer his citizenship from one state to another. *Morris v. Gilmer,* 129 U.S. 315, 328, 9 S.Ct. 289, 32 L.Ed. 690 (1889). A person may have only one domicile at a time and, until a new one is acquired, the established one continues, Restatement 2d, Conflict of Laws § 19 (1971), and, once acquired, the presumption is that it continues until changed. *Mitchell v. United States,* 21 Wall. 350, 88 U.S. 350, 353, 22 L.Ed. 584 (1874). It has long been the rule that motive for the change in residence is irrelevant in determining domicile. *Williamson v. Osenton, supra,* 232 U.S. at 625, 34 S.Ct. 442, *Morris v. Gilmer, supra; Peterson v. All City Insurance Co.,* 472 F.2d 71, 74 (2d Cir. 1972).

There is an overlay of federal jurisdictional requirements that must also be considered. For purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(1), state citizenship is the equivalent of domicile. *Williamson v. Osenton, supra,* 232 U.S. at 624, 34 S.Ct. 442. Domicile at the time suit is filed is the test and jurisdiction once established is not lost by a subsequent change in citizenship. *Smith v. Sperling,* 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1 L.Ed.2d

---

**3.** The district court seemed to attach significance to this, but there is no evidence to contradict her deposition statement that one Jose Critz, presumably unknown to her, occupied the apartment during the years she was away. Since the apartment was owned by the University for the use of its faculty, we think it logical that it be occupied at all times. No explanation was given by Mrs. Hawes as to how she obtained the same apartment upon her return to Puerto Rico.

1205 (1957). The rule is that statutes conferring diversity jurisdiction are to be strictly construed. *Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 86 L.Ed. 951 (1942); *Indianapolis v. Chase National Bank,* 314 U.S. 63, 76, 62 S.Ct. 15, 86 L.Ed. 47 (1941); *Healy v. Ratta,* 292 U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248 (1934); *Janzen v. Goos,* 302 F.2d 421, 424 (8th Cir. 1962). This means that, if a plaintiff's claim of diversity is challenged, the plaintiff has the burden of proof. *Thomson v. Gaskill, supra, Janzen v. Goos, supra.*

■ The standard of review, particularly in a case like this where there was no evidentiary hearing, must also be considered. While the determination of domicile is a mixed question of law and fact, the finding is not to be set aside unless clearly erroneous pursuant to Fed.R.Civ.P. 52(a). *Janzen v. Goos, supra,* 302 F.2d at 423–26; 13 Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction § 3612 at 725–26 (1975).

Relying heavily on *Stifel v. Hopkins,* 477 F.2d 1116 (6th Cir. 1973), the court below found that "plaintiff's intention to change domicile is tainted by the fact they were forced to move to New York due to Mr. Hawes' illness." We think the reliance on *Stifel* was misplaced and the finding of taint clearly erroneous. In *Stifel,* the Sixth Circuit reversed a ruling by the district court that, as a matter of law, a prisoner who is incarcerated in a state other than the state of his domicile prior to conviction cannot show that he is citizen of the state of incarceration for purposes of federal diversity jurisdiction. After an exhaustive and penetrating review of the cases and authorities relative to domicile dictated by physical or legal compulsion, the court had this to say.

The foregoing examples warrant two observations. First, the bare fact that a person has been "compelled" to relocate within a particular jurisdiction does not ordinarily prevent him from becoming domiciled therein, although courts are justifiably concerned with substantiating declared intentions. Second, persons are "compelled" to relocate by a variety of circumstances, ranging from pursuit of employment to therapeutic dictates for illness; from the desire to attend educational or vocational institutions to the demands of the sovereign. Although these forces may differ in kind, they often equate in degree, and yet the law in this area has developed along the lines of *per se* rules tailored to the type of compulsion being exerted rather than in the direction of varying standards of proof directly with the strength of the constraints upon individual freedom of action.

*Id.* at 1124.

The district court's characterization of the move to New York City by Mr. and Mrs. Hawes as being tainted is clearly not in accord with *Stifel* or any other case as far as we can determine. This is not a situation where the change in residence is made solely for the purpose of invoking federal jurisdiction, but, as we have already pointed out, such a motive does not defeat a bona fide change in domicile. *Peterson v. All City Insurance Co., supra,* 472 F.2d at 74.[4]

There is a difference between intention and desire. Here, the plaintiffs clearly intended to move to ʻNew York City for as long as John Hawes' physical condition required. Although the move was not one they desired, they made a deliberate decision to go to New York City for an indefinite period of time. Once there, Mrs. Hawes took all the steps necessary to acquire a new domicile. She rented an apartment, obtained a New York driver's license, enrolled her child in school, and obtained

---

4. Most of the cases involving changes in domicile due to illness are cast contrary to the situation here. Usually, the invalid who has moved to a more salubrious state, wishes to retain his former domicile. *See* 13 University of Pittsburgh Law Review Note at 703–07 (1952); Restatement 2d, Conflict of Laws § 18 at 73.

employment, part-time at first in the suburbs to be near her emotionally disturbed daughter and then full time in Manhattan. The fact that Mrs. Hawes left her furniture with friends in Puerto Rico does not indicate to us, as it did to the district court, an intention to retain the family domicile in Puerto Rico. She and her husband left Puerto Rico under less than favorable conditions. The fact that Mrs. Hawes, her daughter, and her husband had to leave on short notice does not, under these circumstances, mean that they were going to New York City only as temporary visitors. This case is strikingly similar to that of *Leavitt v. Scott*, 338 F.2d 749 (10th Cir. 1964), where the Court of Appeals upheld a finding of diversity jurisdiction by the district court on the following facts.

At the time of Scott's accident, March 6, 1962, he owned a home at Moab, Utah, in which he resided with his wife and children. After his attempt and failure to return to and perform his original employment he was advised by his doctor, as a therapeutic measure, to seek outdoor work of an undemanding nature requiring a minimum of responsibility. In August of 1962 he obtained a job as a hand upon a Colorado ranch and in September the entire Scott family moved to Collbran, Colorado. The change of locale and the simplicity of work did not benefit Scott's condition, his mental perplexity and lack of memory persisted, and in October, 1963, the family moved back to Moab, Utah.

The defendant Leavitt is a citizen of Utah. At the time of the accident and at the time of trial the plaintiff was a citizen of Utah. This action was commenced January 25, 1963, at which time the plaintiff was residing in Colorado. The trial court specifically and specially found that in January of 1963 Scott was a citizen of Colorado and that the required diversity of citizenship conferred jurisdiction upon the court. We find the evidence to be substantial when considered in its most favorable aspect in support of the finding

and consequently that the finding is not clearly erroneous. Rule 52(a), Fed.R. Civ.P. The motive of the family move to Colorado is not disputed—it was made upon medical advice for the potential benefit of Mr. Scott's health. The evidence indicates an intent for permanent change, dependent, of course, upon Mr. Scott's condition. The family belongings were moved; the children were enrolled in Colorado schools; Mrs. Scott entered into community and church activities in Collbran; and the Moab home was leased upon a yearly basis. Mrs. Scott testified that the Moab property was not sold outright because a continuing income was necessary for the family. Although the roots of the Scott family were undoubtedly in Utah and both Mr. and Mrs. Scott frankly entertained the hope that they could one day return to their home in Moab, the move to Colorado was still made with the then present intent of remaining and establishing a Colorado residence. Such is sufficient to establish citizenship within the requirements of 28 U.S.C. § 1332. *Mid-Continental Pipe Line Co. v. Whiteley*, 10 Cir., 116 F.2d 871. Since jurisdiction, once established, is not lost by a change in citizenship, *Smith v. Sperling*, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205, the trial court correctly found jurisdiction to exist.

*Id.* at 751.

■ The district court was impressed by the fact that, after her husband's death, Mrs. Hawes obtained a job with the University of Puerto Rico and a year and one-half later returned to the Island. The time of filing suit is, of course, the critical date. But, even if this eventual return to Puerto Rico can properly be considered on the question of intent, it is negated by the incontrovertible fact that after her husband was placed in an institution in Mexico, Mrs. Hawes remained living in New York City for over a year. She was financially unable to go to Mexico to visit her husband. If she intended to return to Puerto Rico as soon as

possible, the time to do so was when her husband left for Mexico in August of 1974.

While we agree with the district court that an after-the-event affidavit in this kind of case is suspect, the facts as to what transpired in New York are uncontradicted. Although the court was not required to believe the facts set forth in the affidavit if unreasonable or improbable, *Janzen v. Goos, supra,* 302 F.2d at 427, the facts covering the New York residency are both reasonable and logical and do not contradict any statements made by Mrs. Hawes in her deposition or interrogatories. Since there were no contradictions in any of the statements given by Mrs. Hawes and since none of the statements was unreasonable or improbable and since the case was decided without a hearing, there could be no credibility determination made adverse to Mrs. Hawes. Although we give no weight to the conclusionary statement in the affidavit as to intention, we must weigh the facts set forth therein on the question of intent.

The district court felt that it was significant that the elder daughter did not move to New York City with her parents and this detracted from the intent of Mr. and Mrs. Hawes to make New York City their domicile. Since Ana Francisca was eighteen at the time, we cannot attach much significance to her remaining in Puerto Rico.

The district judge stated in his opinion, "Almost a year had elapsed [at time of filing suit] since they were forced to move to New York and they had not even tried to rent their property in Puerto Rico." The only reference to renting the property in Puerto Rico is at page 56 of Mrs. Hawes' deposition, A–156. In answer to a question as to whether the farm house was rented during the time she and her husband lived in Puerto Rico, she said: "It was rented afterwards, but not then." This is hardly the basis for a finding that the Haweses "had not even attempted to rent their property in Puerto Rico." [5] Nor should the fact

that Mrs. Hawes took a leave of absence from the University in order to preserve her retirement benefits be held as negating her intent to reside indefinitely in New York City after she and her husband had moved there. Like many others who have been fortunate enough to reside for a time on the beautiful Island of Puerto Rico, she undoubtedly had a "floating intention" to return at some future date. But it is the intent at the time the suit was brought that controls. She was entitled to keep her future options open. Moreover, her eventual return to Puerto Rico was not prompted by any long-standing commitment by the University, but by the offer of a new job. We find nothing in the record to substantiate the district court's finding that Mrs. Hawes had to return to Puerto Rico to complete the requirements of retirement. She testified in her deposition that since she had almost twenty years of service prior to leaving, she was told that if she kept getting leaves, she could apply for retirement at age fifty-eight. But even, if the district court were correct in this regard, it could not affect her status as a New York citizen in April of 1974.

Based on the facts, we think that the only reasonable conclusion is that Mr. and Mrs. Hawes had acquired a domicile in New York City at the time suit was filed.

*Reversed and remanded for further proceedings.*

---

5. There were some statements made at oral argument about renting the farm, but this, of course, is not evidence.