### In the Matter of Richard Hugh FITZGEREL, and Lucille Ruth Fitzgerel, Debtors.

### Richard Hugh FITZGEREL, and Lucille Ruth Fitzgerel, Petitioners,

### v.

### I.B.E.W., LOCAL UNION NO. 124, Respondent.

### Bankruptcy No. 83–01650–W–13.

United States Bankruptcy Court, W.D. Missouri, W.D.

Aug. 7, 1984.

---

Mendel Small and Scott J. Goldstein, Kansas City, Mo., for petitioners.

Herman M. Shaffer, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo., for respondent.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL ORDER DENYING MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENT WITHOUT PREJUDICE

DENNIS J. STEWART, Bankruptcy Judge.

The petitioners request that the bankruptcy court grant them leave to reject their collective bargaining contract with the respondent Union under § 365(a) of the Bankruptcy Code and the rule of *National Labor Relations Board v. Bildisco and Bildisco,* —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). The issues joined by the debtors' application and the respondent's response thereto came on before the bankruptcy court for hearing on April 16, 1984, and the parties then appeared by their respective counsel. The evidence which was then adduced warrants the following findings of fact.

The only testimony which was presented was that of the debtor Richard Hugh Fitzgerel. He testified that he operated a business which now mainly rewires and remodels service stations; that, when the business started in the 1960's, it did "electrical work," chiefly with respect to the installation, upkeep and repair of air conditioning in residences and small businesses; that his business was currently undergoing a sharp "decline" because of "high labor costs"; that it is necessary to "do something" in the near future "or else [he would have to convert to] chapter 7"; that, when he began his enterprise in the late 1960's, he met with some early success because 95% of his competitors were unionized concerns; that, at the present time, however, virtually all of his competitors are nonunion employers; that, accordingly, they have a significant advantage over him in price competition when he must honor the collective bargaining contract's requirement that he contribute to the union trust fund for fringe benefits by the 15th of each month; that his contributions made in such a manner approximate $2.00 to $3.00 or more per hour per man so that his yearly contribution amounts to about $8,000.00 per man; that he has, in the recent past, lost a "large amount" of business to his competitors because of the pricing advantage which this has given them; that, together with his other monthly bills for necessaries,[1] the contributions combine for a total of approximately $4,000.00; that he proposes to pay all creditors 100% of their

1. The debtor's monthly take-home pay is represented in the schedules to be $4,633.00.

claims if the chapter 13 plan is to continue, but otherwise, in straight liquidation, the unsecured creditors will receive nothing while there is collateral available for the secured creditors which will approximately equal their outstanding respective secured indebtedness; that he has attempted without success to negotiate with the Union to modify the collective bargaining contract; that it seems to him unlikely that the Union would negotiate simply to reduce the benefits to which they are already entitled under the existing collective bargaining contract; that, consequently, he has made no attempt to negotiate with the respondent union subsequent to the filing of the within chapter 13 proceedings; that, since the filing of these chapter 13 proceedings, he has raised his yearly salary by some $6,000.00 per annum to a total of $48,-000.00 per year; that he will make the payment under his chapter 13 plan out of this $48,000.00 per year salary; that, additionally, his wife performs clerical work for his firm at a salary of some $15,600.00 per year and $1,379.20 per month; that he has three or four vehicles which he uses in the business including a 1977 Ford station wagon which he sometimes uses in the business but normally uses as a family car, but the liability insurance on which is paid out of the business; that he owns a house in Warsaw, Missouri, near the Lake of the Ozarks in which he has $11,000.00 to $13,-000.00 equity and on which he makes a monthly payment of $200.00; that his mother "paid for" this property and makes his payment on it when he can't; that the Internal Revenue Service currently has a lien on the lake property to secure an $11–12,000.00 indebtedness to them; that he has not made payments to the union trust fund for several months because "I'm not making money" and "just don't have it"; that the monies which would have otherwise been devoted to the trust fund payments were "used for other expenses," not for personal gain; and that he has not had any vacation for several years because of the necessity of his devoting full time to his business.

## Conclusions of Law

The function of the bankruptcy court as noted above, is to apply section 365(a) of the Bankruptcy Code and the rule of *National Labor Relations Board v. Bildisco and Bildisco,* —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), to the above facts. Section 365(a), *supra,* permits a trustee or debtor-in-possession, "subject to the court's approval ... [to] assume or reject any executory contract or unexpired lease of the debtor." *In Bildisco, supra,* it was held that collective bargaining contracts such as that at bar are "subject to rejection by a debtor-in-possession" under that section. See 104 S.Ct. at 1193. It was further ruled in that case that the standard which the courts should employ in making the determination is whether "the debtor can show that the collective bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." 104 S.Ct. at 1196.

■ The facts which have been found above do not enable the court to render a conclusion that the collective bargaining contract is burdensome to debtors so that it may be rejected by them. The debtor Richard Hugh Fitzgerel, as noted and found above, has admitted on cross-examination that he has raised his own salary by some $6,000.00 since the filing of the petition to the level of $48,000.00 and that his wife is currently employed as a bookkeeper at an annual salary of $15,600.00. The increase in Mr. Fitzgerel's salary alone nearly equals the yearly contributions to the Union trust fund which are commanded by the collective bargaining contract. There is a failure of proof to the effect that the contributions to the trust fund are responsible for the debtors' inability to compete with other contractors in the same business. This is so not only by reason of the failure to justify the $6,000.00 raise in Mr. Fitzgerel's salary by demonstrating its necessity in terms of the need for capital investment or expenses or the like, but also by reason of the lack of particularity of the evidence as to the precise nature and magnitude of

the inability to match or better the bids of his competitors. On this crucial issue, only the general and conclusionary testimony of Mr. Fitzgerel has been presented to the effect that he has not been able to compete with his competitors. The holding of the Supreme Court in the *Bildisco* case, *supra*, demands more particularization than this.[2] And that rule is especially applicable in a case such as that at bar when, without it, it appears that the alleged inability to compete may as well and reasonably be attributed to the postpetition raise in the debtor's salary as to the duty to contribute to the trust fund which is imposed by the challenged collective bargaining contract.

The court is mindful that the debtor, in his testimony in support of his petition to reject the collective bargaining agreement, has admonished that the court's failure to permit rejection of the agreement will only be met by the debtors' converting these chapter 13 proceedings, in which it is proposed to pay creditors 100% of their claims, to chapter 7 proceedings, in which the unsecured creditors, it is alleged, will receive nothing. It is true that the court cannot in chapter 13 proceedings, prevent such a voluntary conversion by the debtor.[3] But the interposition of the court between this Scylla and Charybdis can only be met with an attempt to apply the principles of § 365 and of the *Bildisco* case, *supra*, with faithfulness to the facts of this case. In making such an application, the court must consider the effect of rejection's being followed by liquidation and the comparative impact that it will have on the various competing interests—the debtors, their employees, and the creditors. See 104 S.Ct. at 1197 to the following effect:

"Determining what would constitute a successful rehabilitation involves balancing the interests of the affected parties— the debtor, creditors, and employees. The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would be imposed on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only *the degree of hardship*, but also any qualitative differences between the types of hardship each may face." (Emphasis added.)

As noted above, however, the evidence which has been adduced in this case does not make it clear that any hardship is being suffered by the debtors on account of the collective bargaining contract. If more were adduced in support of the wage increases and more in the way of evidence as to the *degree* of reduction of benefits which may be necessary to make the debtors' business competitive, then this assessment might be better made by the court. But, as the record now stands, it cannot be concluded that the hardship which is being allegedly suffered in the realm of competitive bidding is attributable to the collective bargaining contract.

Further, under the developing decisional authority, a bankruptcy court has the power and duty to protect creditors in a chapter 13 case against the adverse effects of the debtors' voluntary dismissal of a chapter 13 case by imposing appropriate conditions on the dismissal.[4] If, under these circumstances, the creditors' claims are re-

**2.** As is noted on page 631 of the text of this memorandum, the court must scrutinize the particular circumstances of each case, taking note of not only the degree of hardship which may be imposed if the collective bargaining contract is not rejected, but also "any qualitative differences between the types of hardship." Such an analysis and scrutiny would require more than the evidence and information which is now before the court.

**3.** The literal wording of section 1307(a) of the Bankruptcy Code is that "(t)he debtor may con-

vert a case under this chapter to a case under chapter 7 of this title at any time." And the legislative history of that section indicates that this "gives the debtor an absolute right of conversion to a liquidation case at any time." House Report No. 95–595, 95th Cong., 1st Sess. 428 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6383.

**4.** See, e.g., *In re Gillion*, 31 B.R. 550 (Bkrtcy.E.D. Ark.1983).

duced to zero by conversion, it appears that the reduction cannot be attributed to the collective bargaining contract, absent a more detailed showing than has already been made, but rather only to the debtors' unilateral decision to convert. This court must therefore condition any such conversion as follows: the conversion and subsequent granting of a discharge will be made contingent upon the debtors' reasonably negotiating with the union to determine what level, if any, of reduction of benefits is commensurate with the debtors' need to be competitive in their field of business endeavor. If all that is reasonably possible is done in this regard, then the court may relieve the condition.

■ In fact, the failure of the present record before the court to demonstrate that reasonable efforts to negotiate have been undertaken is a separate and independent reason for denying the within motion to reject the collective bargaining contract. The rule of *Bildisco, supra,* 104 S.Ct. at 1196, requires that "[b]efore acting on a petition to modify or reject a collective-bargaining agreement ..., the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution ... The Bankruptcy Court need step into the process only if the parties' inability to reach an agreement threatens to impede the success of the debtors' reorganization." The paucity of evidence in the record on the crucial issue of what degree of union benefits is consistent with the purpose of the chapter 13 arrangement points up the

necessity and desirability of further negotiations between the debtors and the respondent union. Accordingly, this court believes that the condition to be placed on any conversion to chapter 7 is justified by *Bildisco's* requirement that the court "must focus on the ultimate goal of Chapter 11 when considering these equities," 104 S.Ct. at 1197, and when the court in a chapter 13 case must impose the condition in order to ensure that the equities are properly balanced.

It will therefore, for the foregoing reason, be held that the collective bargaining agreement should not be rejected under the current circumstances.

### The timing of this decision

The court has delayed its decision in this case because the vicissitudes of bankruptcy court jurisdiction and power in the recent past have made it doubtful whether it had the trappings of juridical legality to render the decision. At the time this case was initially taken under advisement on April 16, 1984, it appeared that the bankruptcy court may have been operating under a questionable jurisdictional statute.[5] It further appeared that, with the end of the transition period approaching, the jurisdictional question might be resolved, or at least clarified by means of a jurisdictional statute possibly having retroactive effect.[6] Instead, this period culminated in no resolution of the jurisdictional question and further complicated the matter by placing additional doubt on the power of the bankruptcy judges to act.[7] Accordingly, in now

---

**5.** The statute then in existence purported to extend the effectiveness of sections 404(a) and (b) of the Bankruptcy Reform Act of 1978 to June 20, 1984. Section 404(b), in turn, provided that, during the period for which it was extended, the then sitting bankruptcy judges should "serve in the court of bankruptcy ... in the manner prescribed by this title." That title, Title IV of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, provided at section 405(a) and (b) that the bankruptcy judges then sitting might exercise the "jurisdiction and powers conferred by," *inter alia,* section 241 of the Bankruptcy Reform Act, the same section which the plurality opinion in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d

598 (1982), had held to be within the competence only of an Article III court.

**6.** This hope was based upon the provision of section 409(a) of the transition statute providing for transfer of all cases to the new bankruptcy court as of the end of the transition period.

**7.** "As of this date, it is contended by some that the added tenure granted to bankruptcy judges by the Bankruptcy Amendments Act of 1984 is unlawful and that exercise of any power under that statute can only result in an order or judgment which is null and void. This is the position of the Administrative Office of United

rendering its decision, the bankruptcy court must avail itself of the jurisdiction which attached in this matter as of the date of its filing, January 13, 1984, when the bankruptcy court was able to rely upon its inherent, nonstatutory jurisdiction to adjudicate matters arising in the administration and distribution of the bankruptcy estate.[8] And, with respect to such a case, the bankruptcy judge has power as a holdover judge to make the determination in accordance with the evidence formerly heard.[9]

It is therefore, for the foregoing reasons

ORDERED, ADJUDGED AND DECREED that the within motion to reject the collective bargaining agreement be, and it is hereby, denied without prejudice.[10]

States Courts, which has insisted that former bankruptcy judges, whose tenure, they insist, ended as of June 27, 1984, instead exercise judicial authority only as United States magistrates. On the other hand, others contend that the reappointment effected by the Bankruptcy Amendments Act of 1984 is not only effective but also renders any actions undertaken in bankruptcy cases by United States magistrates null and void. But this court need not resolve that dispute with respect to the actions at bar, which were filed long before the lapsing of the transition statute on June 28, 1984, created the seeming hiatus in the tenure of bankruptcy judges. As to this action, therefore, the undersigned simply sits in the status of a holdover judge until a successor is appointed. Both the relevant portion of the transition statute and general legal principles support this basis of judicial power. It is to be noted in this regard that the relevant portion of the transition statute, section 404(b) of Public Law 95–598, originally purported to extend the term of a bankruptcy judge to 'March 31, 1984, *or when his successor takes office.*' (Emphasis added.) The successive Congressional extensions of the date of March 31, 1984, properly construed according to time-honored canons of construction, did not delete the language and effect of the initial minimal extension to the time when a successor lawfully takes office. For the form of the successive extensions was simply to replace 'March 31, 1984,' with subsequent dates, finally ending on June 27, 1984, and not to delete the language, 'or when his successor takes office.' In respect of each extension, a subsequent section provided that the term of a sitting bankruptcy judge should 'expire on' the date on which the extension was to end. But this did not purport to end his holdover status as contained in the language, 'or when his successor takes office.' Accordingly, according to the lasting effect of the transition statute, the undersigned, as to the action at bar, continues to sit as a holdover judge.... (And), under the general law, even in the absence of such a statutory provision, a judge whose term of office runs out ordinarily retains power to act, *de facto* if not *de jure,* until

his successor is appointed, with respect to actions filed prior to the end of his term of office. 'There is authority that even in the absence of statute it is the right and duty of an incumbent judge to hold over and exercise the duties and functions of the office until ·his successor is appointed ...' 16 Am.Jur.2d *Judges* section 16, pp. 105–106 (1969). This theory of the *de facto* power of the sitting bankruptcy judges finds support in the very recent order issued in *Matter of Walker,* Civil Action No. 83–6005–CV–SJ (W.D.Mo. July 12, 1984), by the distinguished district judge of the St. Joseph Division, the Honorable Howard F. Sachs." *Matter of Monson,* Adversary Action No. 82–0741–SJ (Bkrtcy. W.D.Mo. July 18, 1984).

8. "Jurisdiction ordinarily attaches as of the time of the filing of the petition or complaint to commence an action and its extent and character are ordinarily defined by the law in effect at that time. 'The time of filing suit is, of course, the critical date.' *Hawes v. Club Ecuestre El Comandante,* 598 F.2d 698, 703 (1st Cir.1979). 'The general rule is that a court's acquisition of jurisdiction over a case depends on the facts existing at the time its jurisdiction is invoked ... And where, in view of the facts existing at the beginning of the proceedings, the court has acquired jurisdiction over a case, that jurisdiction is ordinarily not ousted by subsequent events.' 20 Am.Jur.2d Courts, section 142, p. 491 (1965)." *Matter of Monson,* Adversary Action No. 82–0741–SJ (Bkrtcy.W.D.Mo. July 18, 1984). As to the predicate of jurisdiction existing at the time of the filing of the within motion, see *Matter of Brown,* 26 B.R. 119 (Bkrtcy. W.D.Mo.1983).

9. See note 7, *supra.*

10. The debtors claim that the union will not negotiate because, under the relevant contract, they must grant other employers the same concessions which they grant him. But it may develop that the debtors, by reason of the potential for conversion to chapter 7 after reasonable negotiation, have additional leverage because of these proceedings.