In the Matter of Marvin Ray MAJOR,
and Debra Ann Major, Debtors.

CENTERRE BANK OF
NEOSHO, Plaintiff,

v.

Marvin Ray MAJOR, and Debra Ann
Major, Defendants.

Bankruptcy No. 83–01770–SW.

Adv. No. 84–0221–SW.

United States Bankruptcy Court,
W.D. Missouri,
Southwestern Division.

Sept. 6, 1984.

Gregory Stremel, Johnson & Berry, Neosho, Mo., for plaintiff.

R. Deryl Edwards, Joplin, Mo., for defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL DECREE OF NONDISCHARGEABILITY OF DEFENDANTS' INDEBTEDNESS TO PLAINTIFF IN THE SUM OF $1,997.07 AND JUDGMENT THAT PLAINTIFF HAVE AND RECOVER THE SAME SUM FROM DEFENDANTS

DENNIS J. STEWART, Bankruptcy Judge.

This is an action in which the plaintiff complains that the defendants willfully and

maliciously converted a portion of the value of an automobile in which it claimed a security interest. The factual issues joined by the pleadings came on before the court for hearing on August 17, 1984, in Joplin, Missouri, whereupon the plaintiff appeared by counsel, Gregory Stemel, Esquire, and the defendants appeared personally and by counsel. The probative evidence of record then adduced warrants the following findings of fact.

The defendants were in the business of selling used cars. In order to sustain their business, they had a "floor plan" line of credit arrangement with the plaintiff bank whereby the bank would make loans and take security interests in automobiles purchased or traded for by the defendants. When the vehicles were sold, the proceeds of sale were to be turned over to the plaintiff.[1] The defendants were apparently entitled to keep only such proceeds of a sale as exceeded the balance due on the particular security agreement applicable to the vehicle which was sold.[2]

On January 31, 1983, the defendants had gained possession of a 1982 Datsun on which they borrowed the sum of $6,657.47 from plaintiff. In April of 1983, without the express permission of the plaintiff, but in the ordinary course of business as contemplated by the parties, the defendants purport to have traded the 1982 Datsun for a 1978 Pontiac Bonneville and some $577.07 in cash. The $577.07 thus received was paid over to the bank, but, according to the evidence, not as the proceeds of sale of the 1982 Datsun. Rather, it appears that this payment was simply regarded as a periodic payment on account of outstanding principal and interest. Thus, according to the uncontradicted evidence, some $200 was credited against principal and the remainder was credited as interest. The evidence clearly shows that this payment was not represented at the time as it was made, as the proceeds of sale of the 1982 Datsun. It does not appear that this was then the intention of the defendants. In fact, at a still later time, on May 2, 1983, when they obtained another extension of credit from the plaintiff, they continued to represent that they had the 1982 Datsun to offer as collateral.[3] Then, on July 7, 1983, the debtors filed their petition for relief under title 11 of the United States Code. Pursuant to a grant of relief from the stay by the bankruptcy court,[4] the plaintiff repossessed the 1978 Bonneville, ultimately gaining actual possession of it only after it had been committed for safekeeping for an intervening time to a third party.[5] Either during this intervening period of time or shortly before it, the defendant Marvin Major was seen driving the 1978 Pontiac Bonneville. When previously viewed on the defendants' lot by the bank's vice president, Charles L. Crawford, the Bonneville appeared to be without any ostensible defect. But when the bank ultimately gained actual possession of it, the tires were bald;

---

1. This is established by the unanimous testimony of the witnesses and parties. There was no controversion on this factual issue.

2. See note 1, *supra*.

3. Testimonially, the defendant Marvin Ray Major stated that this was a mistake made by the bank. But he signed the security agreement and does not now contend that, in doing so, he advised the bank of its error.

4. On November 1, 1983, this court entered its order to the following effect:
   "Comes Centerre Bank of Neosho, NA, Neosho, Missouri, a secured creditor, and Marvin Ray Major and Debra Ann Major, the debtors, by their respective counsel, and having advised the Court that the debtors do not wish to redeem or reaffirm their indebtedness to said creditor on the motor vehicles described in the security agreement, that said creditor has a valid security interest in said collateral, that the debtor has no equity therein, and the Court being otherwise advised,
   "It is hereby ordered that the stay afforded by 11 U.S.C. Section 362 is hereby lifted so as to permit said creditor to enforce its security interest in the aforesaid collateral.
   "It is further ordered that the debtors' right of redemption with respect to the above described property is hereby barred, the debtors having been given reasonable opportunity to redeem and not having done so."

5. According to the testimony, the automobile was for a period of months kept by Bobbie Patterson.

the rods in the engine were knocking; the battery cable had been disconnected and the battery removed; and there were other defects. Similar defects were observed in three other vehicles which were repossessed under the grant of relief from the automatic stay.[6] The 1978 Pontiac Bonneville was ultimately sold by the bank for the sum of $2,000.00, although the evidence tends to show that it would have been worth some $3,420 had the abovementioned defects not been present. There is nothing in the evidence which was adduced in the hearing of this action from which a reliable finding might be made as to the actual value of the 1982 Datsun when it was traded for the Bonneville, other than the testimony of the defendant Marvin Major that the $577.07 which he received in the trade fairly represented the difference between its value and that of the Bonneville.

On a Monday night some 12 to 14 months antecedent to the hearing of this action, at a car auction, the defendant Marvin Major approached used car dealer Clair Moore and asked him if he had any low grade used cars for sale, indicating that he wished to switch collateral on the plaintiff so as to reduce the value available to the bank. Counsel for the defendant objected to the admissibility of this evidence of intention, contending that the reported statement took place after the trade of the Datsun for the Bonneville took place. But the statement well may have taken place prior to the actual switch of the Datsun for the Bonneville. As noted above, there is evidence that the Datsun was still in their possession after May 1983, when it was represented by debtors to be available as collateral for another loan. Further, according to the testimony of the bank's vice president, Charles Crawford, he at the time of one of his visits to the defendants' lot was shown a 1981 Dodge as a replacement for the Datsun and the presence of the 1978 Pontiac Bonneville. This would be consistent with a later acquisition of the Bonneville than that now testimonially claimed by the debtors. Further, the state of mind of the defendants may have been consistent and unchanging during this period of time. And, further, the evidentiary rule which forbids the inferring of an earlier state of mind from a later extrajudicial and contemporaneous statement of such state of mind does not appear to be applicable.[7]

It was the testimony of the debtor Debbie Majors that, contrary to the assertion of the bank's vice president, Mr. Crawford, the bank did not really have possession of the certificates of title during the time periods here in issue; that, rather, she and her husband had possession of those instruments.

## Conclusions of Law

Section 523(a)(6) of the Bankruptcy Code makes liabilities based on wilful and malicious conversion nondischargeable in bankruptcy. The evidence which has been adduced clearly demonstrates that there has been a conversion in the defendants' disposition of the 1982 Datsun on their own account without giving the proceeds over to the plaintiff. The evidence shows clearly and without ambiguity that the defendants understood that the proceeds of sale

---

6. These vehicles and the defects which are described in the plaintiff's evidence are as follows:

| Year and Make | Defects |
| --- | --- |
| 1980 Buick Riviera | Tires bald, no hubcaps |
| 1979 Chevrolet pickup | No battery or cables |
| 1981 Ford pickup | No battery or cables |

7. It is ordinarily not permissible to prove an earlier state of mind by a later extrajudicial statement of the declarant's state of mind as of the time the statement is made. See *Smith v. United States*, 385 F.2d 252, 254 (8th Cir.1967). ("Statements relating to the 'state of mind' of a person are seldom admissible where they 'face backward' to past occurrences.") See also *United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976). But the statement made by the defendant in this case (1) appears, as is noted in the text of this memorandum, to have been made prior to the time of trading of the 1982 Datsun for the 1978 Bonneville and (2) even if it came later, appears, in combination with defendant's explaining that the basis of his motive related to prior dealings with the plaintiff, to constitute an explicit admission of the past existence of this intention.

of the vehicles were promptly to be paid over to the plaintiff.[8] In fact, they claim that they complied with this provision in the agreement between the parties by paying the sum of $577.07 to the plaintiff. But the evidence clearly shows that this payment was neither made nor received in full payment of the note underlying the security agreement, but rather wholly on another account, even as the defendants continued to represent that they still had the 1982 Datsun without turnover of its value to the plaintiff amounted to a conversion.[9]

To be nondischargeable under § 523(a)(6), *supra,* a conversion must be willful and malicious within the meaning of that section. This court has previously noted in its prior decisions the extreme difficulty of proving willfulness and malice under the decisions which govern that standard in this district.[10] These decisions require a showing of a "subjective, conscious" intention to harm the plaintiff, an actual evil intention, as opposed to "legal

malice" which is demonstrable by evidence of an intentional violation of a known right of the plaintiff.[11] In this action, however, there is credible evidence of the defendants' actual malice toward the plaintiff. This consists in the statement of Marvin Major to Mr. Moore at an auction of an explicit intention to degrade the bank's security. The evidence is clear to the effect that the defendant Debbie Major did not make this statement nor in any way adopt it as her own. But her testimony in the hearing of this action otherwise ensured, not only an acquiescence, but also a participation in the actions taken by her husband in trading cars. She generally aided her husband in the business, and, according to her testimony, particularly in respect of effecting transfers of automobiles and keeping records of the same.[12] The evidence therefore warrants a finding of intent to harm the plaintiff on her part, as well as that of her husband.

Having concluded that a liability has been created by willful and malicious con-

---

**8.** See note 1, *supra.*

**9.** See note 3, *supra.* "Conversion is an unauthorized assumption and exercise of the right of ownership over the personal property of another to the exclusion of the owner's right." *Dewey v. American Stair Glide Corp.,* 557 S.W.2d 643, 649 (Mo.App.1977).

**10.** See, e.g., *Matter of Adams,* 24 B.R. 252, 254 (Bkrtcy.W.D.Mo.1982), to the following effect: "The decisions in this district which have defined 'willful and malicious injury ... to property,' within the meaning of section 523(a)(6) have generally erected a standard whereby the plaintiff must demonstrate a 'subjective, conscious intent' of the defendant to violate the plaintiff's known right to title or possession of the property. See, e.g., *In re Bellmer,* Civil Action No. 79–6042–CV–SJ (W.D.Mo.1980). Even in cases decided before the advent of the new Bankruptcy Code, this standard was applied to excuse the conversion of property when the bankrupt had a 'good faith, even though unreasonable' belief that he might deal with another's property as his own. *Matter of Roberts,* 8 B.R. 291, 297 (W.D. Mo.1981)."

**11.** Cf. note 10, *supra.* "A few other decisions ... have continued to apply the pre-code standard. The phrase "willful and malicious injuries to the person or property of another" in 11 U.S.C. section 523(a)(6) does not necessarily connote ill will or special malice, A wrongful

act done intentionally without just cause or a lawful basis is sufficient.' *Matter of Friedenberg,* 12 B.R. 901, 905 (Bkrtcy.S.D.N.Y.1981)." *Matter of Adams, supra* note 10, at 254–255.

**12.** In the hearing of the action at bar, she testified that she knew where the certificates of title were in respect to the vehicles in question; that she knew of the transfer in question and when and how it was made; and that she was aware generally of the conduct of the business and of this particular transaction. According to her testimony, she was a joint custodian of the documents evidencing title and would have had to join in effecting the transfer in question which constituted a willful and malicious conversion of the property. "A person may be guilty of a conversion by actively aiding or abetting or conniving with another in such an act. This is true of a person who procures or instigates an act of conversion, such as a person who directs an officer to commit an act constituting a conversion. Indeed, one may be liable for assisting another in a conversion though acting innocently. These rules are particularly applicable where the defendant received benefit from the conversion, and subsequently approved and adopted it." 18 Am.Jur.2d *Conversion* sec. 120, p. 231 (1965). And the exchange of the initial automobile for one so obviously of cheapened value warrants an inference of a subjective intention on the defendant's part which was the equivalent of willful and malicious.

version, it is the duty of the court to enter a decree of nondischargeability.

Accordingly, it settles upon the court to determine the magnitude of the nondischargeable liability. The measure of damages for conversion is the value of the chattel converted.[13] As noted above, the only evidence of the value of the 1982 Datsun in this case is the uncontroverted testimony of the defendant Marvin Majors that it was worth $577.07 more than the 1978 Pontiac Bonneville. There was other testimony to the effect that the 1978 Pontiac Bonneville had a value of $3,420.[14] Thus the value of the 1982 Datsun was $3,997.07, $2,000 of which was realized by

**13.** "The measure of damages for conversion is the value of the property converted." *Dewey v. American Stair Glide Corp.*, 557 S.W.2d 643, 649 (Mo.App.1977).

**14.** This was the testimony of one Mahurin, who purchased the automobile from the plaintiff and who rendered his opinion on the basis of his not inconsiderable experience in the profession of buying and selling automobiles.

**15.** See note 6, *supra.* There is no evidence of any deliberate trading of these vehicles for others of lesser worth; nor any evidence of intentional injury or damage.

Because of the torrent of questions concerning bankruptcy court jurisdiction which continues to be posed, it is necessary to add a final footnote respecting the character of the jurisdiction which is exercised in this action. Under the current Bankruptcy Amendments and Federal Judgeship Act of 1984, it appears that this action would be, at least in part, a "non-core" proceeding which the bankruptcy court, even in the absence of objection, would have to submit to the district court for decision on the basis of its recommended findings and conclusions. See section 157(c)(1), Title 28, United States Code, which provides as follows:

"A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."
"Core" proceedings are defined in section 157(b)(1), Title 28, United States Code, as cases "arising under title 11, or arising in a case under title 11." The problem which is created under this subsection with respect to a dischargeability

plaintiff after repossession and liquidation of the Bonneville. The defendants cannot claim credit for the $577.07 against the value of the Datsun, for, as noted above, that has already been credited on another account and, therefore, to accredit it against the Datsun's value would mean giving the defendants double credit. This is so although the defendants admit that, as of the date of the rendition of the check for $577.07 to plaintiff, they should have paid the value of the 1982 Datsun over to plaintiff. There is no evidence of willful and malicious conversion or injury to the other automobiles.[15] Accordingly, it is hereby

case is that, in order for a debt to be determined nondischargeable, it must first be determined that a debt exists. Thus, dischargeability determinations have nearly always been conceived of as having two components: one to determine liability and damages, which arises under state law and not in the bankruptcy proceedings, and the dischargeability determination itself, which arises in the bankruptcy proceedings. See 1A Collier on Bankruptcy para. 17.28A, pp. 1742.5 ff. (1976) (noting that determination of the existence and amount of the debt may be "incidental" to the dischargeability determination so as not to require a jury trial, even where the parties were otherwise entitled to it under state or constitutional law. But the issue here is not the right to jury trial, but rather when the federal judicial power of Article III is engaged.) Thus, under the current statute, it appears that the bankruptcy court might well have to submit this action to the district court for decision on the basis of a report and recommendation.

But, because of questions raised concerning the validity of any orders or judgments issued by bankruptcy judges under the new jurisdictional statute, this court has, with respect to actions filed prior to June 28, 1984, relied upon the jurisdiction which was in effect at the time it attached, i.e., at the time the action was filed. (See, e.g., the memorandum of July 11, 1984, of the Director of the Administrative Office of United States Courts, stating in part that "decisions by bankruptcy judges relying upon section 121 for their grant of judicial authority may all be invalidated, extensively disrupting the bankruptcy system and inconveniencing bankruptcy litigants.") And, in instances when there is no jurisdictional statute having a retroactive effect, it is ordinarily the jurisdiction which exists as of the time of the filing of an action which continues to attach until the final order or judgment is entered. "The time of filing suit is, of course, the critical date." *Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 703 (1st Cir.1979).

"The general rule is that a court's acquisition of jurisdiction over a case depends upon the facts existing at the time its jurisdiction is invoked ... And where, in view of the facts existing at the beginning of the proceedings, the court has acquired jurisdiction over a case, that jurisdiction is ordinarily not ousted by subsequent events." 20 Am.Jur.2d *Courts*, section 142, p. 491 (1965). At the time of the filing of the action at bar, May 21, 1984, the bankruptcy court was exercising jurisdiction under the resurrection of section 241 of P.L. 95–595 which conferred upon bankruptcy court the power to hear and determine cases arising and related to the bankruptcy proceedings. See *Matter of Transport Clearings-Midwest, Inc.*, 41 B.R. 528 (Bkrtcy.W.D.Mo.1984), to the following pertinent effect:

"The new jurisdictional statute which was passed on March 29, 1984 ... appears to accomplish ... a simple resurrection of the jurisdictional statute which was stricken as unconstitutional in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 [102 S.Ct. 2858, 73 L.Ed.2d 598] (1982) ... (T)he bankruptcy court ... must be held to be qualified to exercise the jurisdiction of an Article III court or else indulge in the vain exercise of void jurisdiction .... In this respect, ... the bankruptcy court may rely upon a very recent decision of our district court in *Matter of Hamilton*, Civil Action No. 83–6070–CV–SJ (W.D.Mo. May 14, 1984), in which it was held that the bankruptcy court has no authority to render advisory opinions. This seems to recognize—if not the constitutional status of the bankruptcy court—at least its authority to render decisions in an exercise of the federal judicial power. For it is only constitutional courts which cannot render advisory opinions. 'A federal court that is not subject to the limitations of Article III may, of course, be required to render an advisory opinion.' 6A Moore's Federal Practice para. 57.12, p. 57–109, n. 2 (1983). This court therefore concludes that the *Hamilton* decision may provide a basis for the bankruptcy court's current exercise of the federal judicial power."

It is this jurisdiction which the court should exercise. It exercise obviates the question of whether the current appointments of bankruptcy judges are lawful. As to actions commenced prior to June 28, 1984, the current bankruptcy judges sit by virtue of their holdover status under a former appointment. See *Matter of Monson*, Adversary Action No. 82–0471 SJ (Bkrtcy.W.D.Mo.1984), to the following effect:

"The current power of the bankruptcy court to act, also, is derivative of the power which existed at the commencement of the action. It is clear under the current situation enveloping the bankruptcy court that its power to act is a question which is slightly different from that of its jurisdiction. As of this date, it is contended by some that the added tenure granted to bankruptcy judges by the Bankruptcy Amendments Act of 1984 is unlawful and that exercise of any power under that statute can only result in an order or judgment which is null and void. This is the position of the Administrative Office of United States Courts, which has insisted that former bankruptcy judges, whose tenure, they insist, ended as of June 27, 1984, instead exercise judicial authority only as United States magistrates. On the other hand, others contend that the reappointment effected by the Bankruptcy Amendments Act of 1984 is not only effective but also renders any actions undertaken in bankruptcy cases by United States magistrates null and void. But this court need not resolve that dispute with respect to the actions at bar, which were filed long before the lapsing of the transition statute on June 28, 1984, created the seeming hiatus in the tenure of bankruptcy judges. As to this action, therefore, the undersigned simply sits in the status of a holdover judge until a successor is appointed. Both the relevant portion of the transition statute and general legal principles support this basis of judicial power. It is to be noted in this regard that the relevant portion of the transition statute, section 404(b) of Public Law 95–598, originally purported to extend the term of office of a bankruptcy judge to 'March 31, 1984, *or when his successor takes office.*' (Emphasis added.) The successive Congressional extensions of the date of March 31, 1984, properly construed according to time-honored canons of construction, did not delete the language and effect of the initial minimal extension to the time when a successor lawfully takes office. For the form of the successive extensions was simply to replace 'March 31, 1984,' with subsequent dates, finally ending on June 27, 1984, and not to delete the language, 'or when his successor takes office.' In respect of each extension, a subsequent section provided that the term of a sitting bankruptcy judge should 'expire on' the date on which the extension was to end. But this did not purport to end his holdover status as contained in the language, 'or when his successor takes office.' Accordingly, according to the lasting effect of the transition statute, the undersigned, as to the action at bar, continues to sit as a holdover judge.

"Further, under the general law, even in the absence of such a statutory provision, a judge whose term of office runs out ordinarily retains power to act, *de facto* if not *de jure*, until his successor is appointed, with respect to actions filed prior to the end of his term of office. 'There is authority that even in the absence of statute it is the right and duty of an incumbent judge to hold over and exercise the duties and functions of the office until his successor is appointed ...' 16 Am.Jur.2d *Judges* section 16, pp. 105–106 (1969). This theory of *de facto* power of the sitting bankruptcy judges finds support in the very recent

ORDERED, ADJUDGED AND DE-CREED that defendants' indebtedness to plaintiff in the sum of $1,997.07 plus interest at the legal rate from and after May 2, 1983, be, and it is hereby, declared to be nondischargeable in bankruptcy. It is further

ADJUDGED that plaintiff have and recover the same sum from defendants.

order issued in *Matter of Walker*, Civil Action No. 83–6005–CV–SJ (W.D.Mo. July 12, 1984), by the distinguished district judge of the St. Joseph Division, the Honorable Howard F. Sachs."