# United States Court of Appeals

## For the First Circuit

No. 03-1670

CARLOS A. GARCÍA PÉREZ, ET AL.,

Plaintiffs, Appellants,

v.

ALVARO SANTAELLA, M.D., ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. Garcia-Gregory, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Selya, Circuit Judge.

Joan S. Peters with whom Andrés Guillemard-Noble and Nachman & Guillemard were on brief for appellants.
José Héctor Vivas with whom Vivas & Vivas was on brief for appellee Iván Terón Méndez.
Raphael Peña Rámon and De Corral & De Mier for appellee Ashford Presbyterian Community Hospital.

April 13, 2004

**COFFIN, Senior Circuit Judge**.  Appellants Carlos A. García Pérez and Gisela M. Baerga Torres, together with their infant daughter Carla Isabel (collectively, the Garcías), challenge the district court's determination that they were domiciled in Puerto Rico when they filed a medical malpractice claim against appellees Dr. Iván Terón Méndez and Ashford Presbyterian Community Hospital. The Garcías contend that they were domiciled in Florida at the time of the filing, thus establishing complete diversity between the plaintiffs and the defendants and conferring subject matter jurisdiction on the district court under 28 U.S.C. § 1332(a)(1). After deliberating upon this well briefed and argued case, we conclude that errors of both law and fact require recognition of Florida as the state of domicile.  We therefore reverse.

## I.  Background

The underlying medical malpractice claim arose out of the May 6, 1996, birth of quadruplets to Carlos and Gisela.  At the time, the Garcías were living in Gurabo, Puerto Rico.  The babies were premature and only one child - Carla Isabel - survived.  She suffered from a variety of complications requiring ongoing and intensive medical care.  In June 1996, having already lost three of the quadruplets while they were in the care of Ashford Presbyterian, the Garcías decided to move Carla Isabel to Miami Children's Hospital.

On May 5, 1997, the medical malpractice claim was filed. Discovery on the merits continued until March 23, 2001, when appellee Terón Méndez filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1), alleging that the Garcías were domiciled in Puerto Rico, and the court therefore lacked subject matter jurisdiction. Ashford Presbyterian joined this motion.

A magistrate judge's report and recommendation, issued February 20, 2002, concluded that the Garcías were domiciled in Florida at the time the suit was filed and recommended that the motion to dismiss be denied. Reviewing the contested portions of the report and recommendation de novo, see 28 U.S.C. § 636(b)(1), the district court reached a contrary determination. The court noted a series of remaining contacts between the Garcías and Puerto Rico, supporting each example with a citation to a particular page and line number of Carlos's deposition, taken on August 8, 2000. At that time, however, the deposition transcript had not been submitted to the court. The only portions of the transcript before the court were five pages submitted with appellants' opposition to the motion to dismiss, but these did not include several portions of the deposition cited by appellees. The district court relied on the appellees' citations. In total, the district court listed eleven factors favoring a Puerto Rico domicile, relying not only on

the citations, but also on the phrasing of appellees' objections to the magistrate judge's report.[1]

Following the court's order of dismissal, appellants moved for reconsideration. They pointed out discrepancies between the facts as described by the district court and the actual deposition transcript. Appellants also argued that the court made a legal error in giving significant weight to Carlos's statement that he would like to return to Puerto Rico at some undetermined point in the future.

Sensing the precarious nature of the court's reliance on their paraphrasing, appellees submitted the entire deposition transcript with their opposition to the motion for reconsideration. The court accepted the invitation and "carefully read the deposition testimony provided." It found nothing to change its conclusion and denied the motion. This appeal ensued.

## II. Standard of Review

The determination of domicile presents a mixed question of law and fact. Bank One, Texas, N.A. v. Montle, 964 F.2d 48, 51 (1st Cir. 1992). To the extent that the motion to dismiss called upon the district court to resolve factual challenges, we will not set aside those findings unless clearly erroneous. Valentín v. Hospital Bella Vista, 254 F.3d 358, 365 (1st Cir. 2001). "'A

---

[1]We note that seven of the factors rely on the deposition testimony that the court did not have before it at the time of its decision.

finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  Lundquist v. Precision Valley Aviation, Inc., 946 F.2d 8, 11 (1st Cir. 1991)(quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)(internal citations omitted)).  We review the court's legal conclusions de novo.  Valentín, 254 F.3d at 365.

### III.  Law of Domicile

The federal courts have jurisdiction over controversies arising between "citizens of different states," provided that the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a)(1). Citizenship is determined by domicile, Lundquist, 946 F.2d at 10, which can be established by demonstrating that the individual is physically present in the state and has an intent to remain indefinitely, Sun Printing & Publ'g Ass'n v. Edwards, 194 U.S. 377, 383 (1904); Hawes v. Club Ecuestre El Comandante, 598 F.2d 698, 701 (1st Cir. 1979).  Once challenged, the party invoking diversity jurisdiction must prove domicile by a preponderance of the evidence.  Bank One, 964 F.2d at 50.  The key point of inquiry is whether diversity of citizenship existed at the time the suit was filed; subsequent events may bear on the sincerity of a professed intention to remain but are not part of the primary calculus.

-5-

Hawes, 598 F.2d at 700; Miranda v. Miranda, 686 F. Supp. 44, 47 (D.P.R. 1988).

Courts typically take into account a variety of factors indicating the extent of a particular party's ties to the purported domicile. These include:

> current residence; voting registration and voting practices; location of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs and other associations; place of employment or business; driver's license and other automobile registration; [and] payment of taxes...

13B Wright, Miller & Cooper, Federal Practice and Procedure § 3612 (2d ed. 1984). See also Bank One, 964 F.2d at 50; Hawes, 598 F.2d at 700. No single factor is dispositive, and the analysis focuses not simply on the number of contacts with the purported domicile, but also on their substantive nature. Lundquist, 946 F.2d at 12 ("[D]omicile need not be determined by mere numerical comparison of the number of factors that may appear to favor each side of the issue."); see also Leon v. Caribbean Hosp. Corp., 848 F. Supp. 317, 318 (D.P.R. 1994) (favoring ties that "could not be easily undone" over more easily established ties).

## IV. **Analysis**

We turn first to two errors of law affecting the baseline of the district court's analysis.

First, the court erred when it gave considerable weight to Carlos's testimony - taken more than three years after the case was

filed - that he thought "just about every other day" of returning to Puerto Rico. In <u>Hawes</u>, we determined that a "floating intention" to return to a former domicile at some unspecified future date does not prevent a party from acquiring a new domicile. 598 F.2d at 701. Carlos's vague and noncommittal language is precisely within the contours of what we consider a floating intention. <u>See</u> <u>Valentín</u>, 254 F.3d at 367 (characterizing a floating intention as "[a]n amorphous desire to relocate from one place to another at an indeterminate future date" and noting that such an "'indefinite and ambulatory future intention. . . is of no real significance'")(citing <u>Hardin</u> v. <u>McAvoy</u>, 216 F.2d 399, 403 (5th Cir. 1954)). As we said in <u>Hawes</u>, an individual is "entitled to keep [his] options open," 598 F.2d at 704. Carlos's statement should not have been a significant element of the court's analysis.

Second, the court erred in enunciating the burden of proving domicile once challenged.[2] The correct burden of proof is preponderance of the evidence. <u>Bank One</u>, 964 F.2d at 50. The district court's opinion is at best confusing on this issue. In initially setting out the burden, the court correctly stated that

---

[2]The initial error seems to have been made in appellees' motion to dismiss, which cited <u>Alicea-Rivera</u> v. <u>SIMED</u>, 12 F. Supp. 2d 243, 245 (D.P.R. 1998), in support of the assertion that the plaintiff must prove a change in domicile by clear and convincing evidence. <u>Alicea-Rivera</u> incorrectly adopted the clear and convincing burden of proof from a Second Circuit case analyzing the law of domicile of New York State. <u>Id.</u> <u>Alicea-Rivera</u> is in conflict with our earlier decision in <u>Bank One</u>, 964 F.2d at 50, and therefore has no precedential value on the burden of proof issue.

-7-

plaintiffs bore the burden of proving domicile by a preponderance of the evidence, citing Bank One. Two paragraphs later, it stated the burden as that of proving domicile by clear and convincing evidence. It cited Valentín, which, however, says nothing about the nature of the burden. Shortly thereafter, the court repeated the clear and convincing evidence standard, erroneously citing Bank One. Finally, the court concluded that plaintiffs "have failed to rebut this evidence [of Puerto Rico domicile] with clear and convincing proof," immediately following this language with an invocation of "preponderance of evidence," citing Francis v. Goodman, 81 F.3d 5, 6 (1st Cir. 1996). Appellants did not raise the issue below,[3] but it is settled in this circuit that an appellate court has discretion, in exceptional cases, to relieve a party of forfeiture. See United States v. La Guardia, 902 F.2d 1010, 1013 (1st Cir. 1990). This is such a case. Not only should the proper burden govern our review, but both courts and lawyers should be aware of the importance of clarity as to the applicable burden of proof. To the extent that the court evaluated the appellants' evidence under a clear and convincing standard, plain error occurred.

---

[3]Upon questioning at oral argument, both parties agreed that the burden was preponderance of the evidence. This was a retreat from appellees' earlier argument in their briefs before this court, which, like the motion to dismiss, incorrectly stated the burden.

We now move on to our factual analysis. The district court marshaled a string of factors favoring domicile in Puerto Rico, which we now review as context for our analysis of factual error.

In concluding that Carlos "lacked the intent to change his domicile to Florida," the district court focused on the couple's remaining contacts in Puerto Rico, which include the fact that at the time the suit was filed, Carlos was employed by Goldman Antonetti (a law firm based in Puerto Rico) and traveled to Puerto Rico for business, that the Garcías rented (rather than sold) their Gurabo house, and that the family left open two Puerto Rico bank accounts and made regular use of an ATM card associated with one of those accounts. The district court also made much of the family's interest in a Taco Maker franchise, from which they derived about 16% of their annual reported income for 1997. Carlos was president of the franchise corporation and Gisela held a contract that paid her approximately fourteen hundred to fifteen hundred dollars a month in exchange for services and advice regarding the operation of the Taco Maker. The district court also pointed to the couple's filing of income tax returns in Puerto Rico (reporting the franchise income).

As we noted earlier, the district court adopted the appellees' version of the facts, including citations to portions of Carlos's deposition transcript that were not submitted to the court. Appellants argue that the district court failed to conduct an

-9-

independent review of the record, misconstrued Carlos's testimony and relied on irrelevant factors, entirely disregarding their contrary evidence.  We now consider these contentions.

A review of the record, including the deposition transcript, reveals that Carlos and Gisela created substantial personal, professional and civic ties to Florida that significantly outweighed their residual ties with Puerto Rico.

First, Carlos and Gisela established that Florida was their personal and financial base.  By the time the lawsuit was filed, they had each registered to vote in Florida, acquired Florida drivers' licenses, sold their car in Puerto Rico, and purchased two cars in Florida.  In addition, the Garcías rented out their Puerto Rico house, unfurnished, on an annual basis.[4]  They opened a Miami bank account, which became the primary account for the family's expenses.  The couple did retain a Puerto Rican bank account, but the district court's reference to "regular" use of the Puerto Rican ATM card is unsupported by the record.  No plausible construction of the cited testimony supports calling the use "regular,"[5] and no

---

[4]In the five years that they lived in Miami, Carlos and Gisela purchased two homes in Florida and had two more children.  In March 1999, Carlos resigned from Goldman Antonetti and joined the Miami office of Rice Fowler, a law firm based in New Orleans.  Although these events, occurring subsequent to the filing of the lawsuit, are not the primary focus of our analysis, we note them as indicative of the sincerity of the family's intent to remain in Florida, see supra at 5-6.

[5]The full text of the exchange is as follows:
Q:  Do you have any credit cards issued by banks in Puerto Rico?

reasonable inference from that portion of the testimony supports a Puerto Rico domicile. This was a clearly erroneous conclusion.

In evaluating the family's financial contacts, the district court further erred in concluding that the Garcías' Puerto Rico tax returns implied a Puerto Rico domicile. Gisela and Carlos used their Miami address on their return. The act of filing the return is not by itself evidence of domicile. As appellants note, any individual deriving income from Puerto Rico is required to file a tax return, regardless of citizenship. Furthermore, the tax return provides no evidence that Puerto Rico was the appellants' financial base; the reported income derived from Puerto Rico was approximately 16% of the family's annual income.

Second, the court's conclusion that Carlos's residual professional ties supported a Puerto Rico domicile is not substantiated by the evidence. By May 1997, Carlos had built a professional foundation for himself in Miami, including studying for and passing the Florida bar exam, working out of an office in his home, and spearheading the opening of a branch office for Goldman Antonetti. He had, by February, not only explored job

A: Any what; I am sorry?
Q: Credit cards?
A: No. I still have the ATH.
Q: Okay, the ATM from Banco Popular?
A: Yes.
Q: Do you use it in Florida?
A: No.
Q: Okay.

-11-

opportunities in Miami but had begun discussions with the head of his firm's litigation department regarding the branch office. Although formal approval was not given until shortly after the complaint was filed, it is clear that Carlos had by that time the settled intent to practice law in Florida, with reasonable expectation of an association in Florida with his firm.[6] Carlos testified that he traveled to Puerto Rico for business, in service to some Puerto Rico clients, on only an "on and off basis."

Third, the evidence demonstrates that the Garcías' role in the Taco Maker corporation involved minimal contacts with Puerto Rico that were more indicative of an investment interest than a substantial tie. Carlos testified that Gisela never traveled to Puerto Rico to render services to the Taco Maker. Neither Carlos nor Gisela was involved in day-to-day operations; Carlos's related travel was in his capacity as president of the corporation, an office which neither requires nor suggests that he was domiciled in Puerto Rico. The district court seemed to think it notable that Carlos filed the corporation's Puerto Rico income tax returns, but this simply demonstrates that he fulfilled what were reasonably his duties as an officer of a closely-held corporation. There is

---

[6]Neither party has provided us with the exact date that the firm formally approved the opening of the Miami office, agreeing only that it was about one month after Carlos passed the Florida bar exam in mid-April.

little support for a Puerto Rico domicile by virtue of these corporate contacts.

Of course, not all factors weigh heavily in favor of a Florida domicile. But our review indicates to us that, although on the surface there are ties to Puerto Rico, in every area those ties appear more tenuous as the evidence is more fully revealed. Financial ties were sharply confined to a limited purpose. Business relations were similarly restricted to infrequent oversight. Meanwhile, the ordinary arrangements for settling into a community were becoming stronger in Florida, by registering to vote, purchasing cars, and contracting to rent an apartment. But most important was the evidence of an intent to remain in Florida and earn a livelihood there: studying for the bar, exploring job opportunities, planning and receiving encouragement for opening a branch office for his firm.

We see the scales in this case as weighted, on the Puerto Rico side, by formal and attenuated connections, while, on the Florida side, by deliberate investment of time and energy in preparing for living and working indefinitely in Florida.

Appellees offer no arguments that undermine this conclusion. Their attempt to characterize the relocation as "forced," and therefore unable to effect a change in domicile, is contrary to precedent. Although the Garcías moved because of a medical emergency, motive does not defeat a bona fide change in domicile.

See Hawes, 598 F.2d at 702 (plaintiffs were not prevented from acquiring new domicile simply because relocation was motivated by urgent need to seek medical care).  Furthermore, rather than take steps to move back to Puerto Rico following the baby's release from the hospital in October 1996, the Garcías strengthened their ties with Florida, including Carlos's commitment a month later to take the Florida bar exam.  See Hawes, 598 F.2d at 703-04 (noting that if Hawes had intended to return to Puerto Rico, "the time to do so was when her husband left for Mexico [after being discharged from a rehabilitation center]").

As far as we can see, the cases relied on by appellees actually support the Garcías' claim.  Alicea-Rivera involved a student who lived with relatives and did not pay for rent, utilities or phone; he retained his Puerto Rico driver's license and held only a part-time job that didn't indicate steps toward a permanent residence.  See Alicea-Rivera, 12 F. Supp. 2d at 246.  This case is quite inapposite, relating primarily to the established principle that out-of-state college students are not domiciliaries of the state in which they go to school.  Id.

Likewise, we are somewhat perplexed by appellees' reliance on Leon, in which the court found that "superficial" ties such as bank accounts, voter registration and drivers' licenses did not - on their own - indicate a change of domicile.  Leon, 848 F. Supp. at 318.  However, studying for and taking the Florida bar exam is just

-14-

the sort of "complicated" and skilled undertaking that the Leon court would have found more convincing evidence of a change of domicile. Id. Furthermore, the Leon court observed that:

> [It] is more significant to examine, however, the bridges back to Puerto Rico that she failed to burn. She resigned from her job, but her employer expected her to return . . . . It was her Puerto Rican checking account that was routinely as reflected by the activity in the check register used. Although she rented out a small apartment . . . , she left her home, with all of the furniture, unoccupied. She did not even discontinue her utility services . . . [H]er late model car was left in Puerto Rico, where it was ready and waiting for her upon her return . . . . Her main source of income, social security payments, continued to be sent to her Puerto Rico address. Likewise, she did not file federal, state or city tax return[s] using her Illinois address, in addition to the filing of her Puerto Rico income return.

Id. In the instant case, not one of these "bridges" remained.

And finally, Valentín, 254 F.3d at 361, which at least presents comparable facts in that the plaintiff relocated in order to seek medical treatment, nevertheless involved a situation in which the plaintiff maintained much stronger connections with Puerto Rico and failed to establish any of comparable significance in Florida. Valentín lived with her sister during her stay in Florida, and kept the bulk of her personal belongings (including a car) in Puerto Rico. Id. at 361-62, 366. Significantly, Valentín did not resign from her position as a nurse in Puerto Rico and she never worked in Florida. She relied on a combination of sick days

-15-

and unpaid leave to cover her stay.  Carlos, on the other hand, actually worked in Miami - either from home or at a branch office.

Correcting for the factual and legal errors, the remaining evidence predominantly establishes that Florida was the Garcías' "true, fixed home and principal establishment," to which, whenever they were absent, they had the intention of returning.  13B Wright, Miller & Cooper, <u>Federal Practice and Procedure</u>, at § 3612.  <u>See</u> <u>also</u> <u>Valentín</u>, 254 F.3d at 366.  The ties remaining with Puerto Rico - ongoing investments and the retention of property in order to benefit from supplemental rental income - are simply the vestiges of longtime prior residence on the island . . . and a nostalgic hope for a far off future.

In sum, an evaluation of the relevant factors under the proper burden of proof leads us to the conclusion that the appellants were domiciled in Florida.

<u>Reversed.</u>