# United States Court of Appeals
## For the First Circuit

No. 15-1800

JOSÉ APONTE-DÁVILA,

Plaintiff, Appellant,

v.

MUNICIPALITY OF CAGUAS,

Defendant, Appellee,

CONSOLIDATED WASTE SERVICE CORPORATION; MAPFRE-PRAICO,

Defendants/Third Party Plaintiffs, Appellees,

EDDIE JIMÉNEZ; EDDIE JIMÉNEZ-COSMO, Cafetería la Terraza de
Eddie; INSURANCE CARRIERS,

Third Party Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Pedro A. Delgado-Hernández, U.S. District Judge]

Before

Torruella, Lynch, and Barron,
Circuit Judges.

David W. Román, with whom José Luis Ubarri and Ubarri & Román
Law Office were on brief, for appellant.
Michael Craig McCall and Pablo H. Montaner-Cordero, with whom
The Law Offices of Michael Craig McCall, Luis E. Pabón Roca,
Clarisa Solá Gómez, and Faccio & Pabón Roca were on brief, for
appellees.

July 8, 2016

**LYNCH**, **Circuit Judge**.  José Aponte-Dávila appeals from the district court's dismissal of his negligence suit for lack of subject-matter jurisdiction.  Aponte-Dávila invokes the federal courts' diversity jurisdiction, arguing that because he was domiciled in Texas and the defendants were domiciled in Puerto Rico at the time the suit was filed, there was complete diversity. The district court found, instead, that both Aponte-Dávila and the defendants were domiciled in Puerto Rico and dismissed the case. We conclude otherwise, that Aponte-Dávila had not abandoned his Texas domicile while receiving medical care in Puerto Rico, and, that in any event, he had reinstated his Texas domicile before suit was filed.  We reverse and remand.

I.

On May 9, 2013, Aponte-Dávila filed a complaint in the Puerto Rico federal district court against the Municipality of Caguas ("Municipality"), Consolidated Waste Service Corporation ("ConWaste"), and MAPFRE/PRAICO, ConWaste's insurance provider. The issue in this case is where Aponte-Dávila was domiciled as of May 9, 2013.

The complaint alleged that on July 13, 2009, Aponte-Dávila was walking on a sidewalk in Caguas, Puerto Rico, when he slipped and fell while trying to pass a dumpster partially obstructing the sidewalk.  As a result of the fall, Aponte-Dávila suffered a series of injuries and was permanently rendered

partially disabled.  Aponte-Dávila alleged that the Municipality and ConWaste, the owner of the dumpster, were negligent under Puerto Rico law for failing to move the dumpster from the sidewalk, and he sought damages for physical harm, mental and moral anguish, loss of earnings, and medical expenses.  He asserted that MAPFRE/PRAICO, as ConWaste's insurer, was jointly and severally liable under Puerto Rico law.

In the complaint, Aponte-Dávila stated that because he was domiciled in Texas and each of the defendants was domiciled in Puerto Rico, the district court had diversity jurisdiction over his state-law tort claims.  See 28 U.S.C. § 1332(a)(1).

Each of the defendants filed an answer denying subject-matter jurisdiction.  ConWaste and MAPFRE/PRAICO filed a third-party complaint against "Eddie Jiménez Cosmo d/b/a Cafeteria La Terraza de Eddie and/or Cafeteria La Terraza de Eddie" claiming that it was responsible for the waste deposited in the dumpster and for maintaining the area around the dumpster.  Cross-claims between the defendants were also filed that are not relevant to this appeal.  The district court held a status conference on November 25, 2014, at which the court's subject-matter jurisdiction was challenged.  The parties suggested that "the issue may be ruled on without an evidentiary hearing," and so "the Court ordered the parties to file simultaneous briefs and supporting documents on the issue."

- 4 -

On January 26, 2015, the defendants filed a motion to dismiss for lack of subject-matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). On the same day, Aponte-Dávila made a filing in support of diversity jurisdiction.[1] On March 6, 2015, the defendants filed a motion to strike sixteen of the documents appended to Aponte-Dávila's filing. The motion to strike was denied on June 5, 2015.

The dispute between the parties boils down to whether on May 9, 2013, the date the complaint was filed, Aponte-Dávila was domiciled in Texas, creating complete diversity and affording the federal district court jurisdiction, or Puerto Rico, defeating complete diversity and depriving the federal district court of jurisdiction.

## II.

The facts relevant to Aponte-Dávila's domicile, which are largely undisputed, are as follows. Aponte-Dávila was born in Río Piedras, Puerto Rico, in 1963. In the late 1980s, after service with the U.S. Army Reserve in Puerto Rico and the Puerto Rico National Guard, he moved to Florida to work as a professional

---

[1] The district court "ordered the parties to file simultaneous briefs and supporting documents on the issue not later than 5:00pm on January 26, 2014." Aponte-Dávila has represented that the district court did not permit the parties to reply to each other's filings regarding jurisdiction. We caution against such a practice of precluding parties from responding to each other's arguments on issues such as this.

- 5 -

truck driver.  After a few years as a commercial dump truck driver in Florida, he moved back to Puerto Rico, bringing his dump truck with him.

In 1998, he moved to Arkansas and obtained an Arkansas commercial driver's license.  From 1999 to 2004, he worked as an interstate truck driver based in Arkansas.  In 1999, he purchased his first semi-trailer truck, a 1995 Freightliner Condo.

In 2004, Aponte-Dávila left his job in Arkansas, moved to Laredo, Texas, and began working for a trucking company called Landstar.  While working for Landstar, he traded in his semi-trailer truck for a 1999 Freightliner Condo.

Later that year, Aponte-Dávila left Landstar, returned his second semi-trailer truck, and relocated to Puerto Rico to help his father, who had fallen ill, with his asphalt business. In 2007, after his father's health improved, he returned to Texas to continue his truck driving career and purchased, with the help of a loan from First National Bank in Laredo, a third semi-trailer truck, a 2001 Freightliner Condo.  From 2007 to 2010, Aponte-Dávila, based out of Laredo, worked for a trucking company called Land Carrier.  He stated that because he was a truck driver, he would frequently stay in Laredo at a hotel, at the trucking company's terminal, or in a small utility apartment, and while on the road he often lived out of his truck.  In 2008, he obtained a Texas Class "A" commercial driver's license.

On July 13, 2009, while in Puerto Rico to marry his second wife, María Teresa Báez, Aponte-Dávila suffered the injury giving rise to the instant lawsuit. He remained bedridden in Puerto Rico until he was able to return to Texas. After the accident, he obtained medical coverage through Puerto Rico's government health plan, then known as "Reforma." When applying for benefits, Aponte-Dávila provided Báez's address in Caguas, Puerto Rico. He explained that he gave Báez's address because that was where he was staying while recovering. He and Báez divorced two years later in September of 2011.

Aponte-Dávila returned to Texas in late 2009 after recuperating from his accident. The back pain caused by his accident prevented him from completing his truck routes with Land Carrier on schedule, so he eventually left Land Carrier and began working for another trucking company called Hotfoot Logistics, which had a terminal in Laredo. His time at Hotfoot Logistics was short lived; after three months, he found that his persistent back pain prevented him from continuing driving.

In September 2010, about a month after he left Hotfoot Logistics, and still based out of Laredo, he started working for Warren Transport. On a personnel form that Aponte-Dávila filled out for Warren Transport titled "Warren Transport wants to get to know you!!!" he wrote "Caguas, Puerto Rico" in the blank space following "I make my home in." He later explained that he had

been directed by Warren Transport to do so.  The form also asked him to provide the names of his family members as well as a list of interests and hobbies.  During his deposition, Aponte-Dávila stated that a dispatcher had told him that the purpose of the form was to list the names of individuals who would be authorized to ride along with him in his truck and so he listed Caguas because that is where Báez, to whom he was still married at that point, lived.  According to Aponte-Dávila, Warren Transport management already knew that he lived in Laredo.  On other Warren Transport forms, he listed his address as a P.O. Box in Laredo.

For the tax years 2007 to 2012, Aponte-Dávila filed all of his federal tax returns using his Texas address.  From 2000 to 2014, he never filed state personal income tax returns in Puerto Rico.

Starting in 2010, Aponte-Dávila began traveling back to Puerto Rico for longer visits to receive physical therapy, staying at Báez's residence in Caguas.  In September 2011, he applied for and received a disability parking permit in Puerto Rico.  In the application for the permit, he stated that his address was in Puerto Rico.  In January 2012, he obtained a Puerto Rico driver's license, which also listed his address as being in Caguas.  He explained that the address he provided was Báez's, even though by that point they had been divorced for several months.

On May 27, 2012, Aponte-Dávila suffered a bout of paralyzing back pain that left him immobile on the ground of a parking lot in Laredo. A week later, he resigned from Warren Transport, sold his truck, threw away everything he had in the truck including clothes and documents, and returned to Puerto Rico to recover at his parents' house in Canóvanas. In early 2013, he filed a Merchant's Registry Certificate with the Puerto Rico Department of Treasury, listing his address as being in Caguas. He also submitted an application to the Medicaid Program of the Puerto Rico Department of Health. In February 2013, his Texas commercial driver's license expired.

Aponte-Dávila returned to Laredo at the end of April 2013. He stayed with a friend and began looking for work as an interstate trucker. He also arranged to attend, in Texas, medical examinations for a Social Security Disability benefits application that he had submitted before leaving for Puerto Rico. An official record from the Texas Department of Public Safety indicates that a medical certificate was issued to Aponte-Dávila on May 6, 2013, as part of his application to renew his Texas commercial driver's license. Aponte-Dávila says that a renewed Texas commercial driver's license was issued to him on the same day. This was three days before the complaint was filed.

On May 9, 2013, the day the instant lawsuit was filed in federal district court in Puerto Rico, Aponte-Dávila says that he

- 9 -

"was physically present in Laredo, Texas organizing his personal and professional affairs to continue residing and working there as he had done the previous nine (9) years since approximately 2004."

In July 2013, Aponte-Dávila leased an apartment in Laredo. Around the same time, he set up electric and cable services with local Texas providers. According to Aponte-Dávila, once he moved into his apartment, he notified the Texas Department of Public Safety of his new address, and on September 30, 2013, a new Texas commercial driver's license was issued to him listing the new address. He says that the Texas Department of Public Safety took and kept the license that had been issued to him on May 6, 2013.

Aponte-Dávila found a job as a contract driver for a company operating out of Laredo in July 2013, but because of his back pain he was only able to complete a handful of trips by early 2014. In September 2013, he filled out a Texas voter registration application, and in November 2013 he voted in Texas. He also purchased a Chrysler PT Cruiser in Laredo and obtained a Texas license plate and disability parking placard.

On March 11, 2014, Aponte-Dávila received a Notice of Decision from the Social Security Administration at his postal address in Laredo informing him that he had been found completely disabled as a result of the paralyzing incident in May 2012, and soon after he began receiving monthly disability payments. In

- 10 -

July 2014, unable to work and declared disabled by the Social Security Administration, he returned to Puerto Rico. He rented an apartment in Puerto Rico in December 2014 and as of January 2015 had not returned to Texas.

## III.

On June 23, 2015, the district court granted the defendants' motion to dismiss for lack of diversity jurisdiction, finding that Aponte-Dávila was domiciled in Puerto Rico on the date that his case was filed. Dávila v. Municipality of Caguas, No. 13-cv-1367, 2015 WL 3889963, at *1 (D.P.R. June 23, 2015). The court found that while Aponte-Dávila "was not a resident of Puerto Rico from the early 1980s until around 2007," after his 2009 injury he reestablished domicile in Puerto Rico because "he refocused his life to obtain medical treatment in Puerto Rico." Id. at *4. The district court noted that by 2012 Aponte-Dávila had "sold his Freightliner Condo truck, thr[own] away everything he owned, . . . traveled to Puerto Rico," "let his Texas Commercial Driver's License expire," and "severed relevant links to Texas, making Puerto Rico his home." Id. The court also placed particular emphasis on forms that Aponte-Dávila submitted to several entities between 2009 and 2013 in which he listed his residence as Puerto Rico. Id. at *5. According to the district court, though he "may have sought to reestablish links with Texas in July 2013 (lease agreement); September 2013 (car purchase, and

- 11 -

Consumer Account Application with Wells Fargo Bank); and October 2013 (voting registration certificate)," these events all occurred after May 2013 and therefore could not support a finding that he had abandoned his domicile in Puerto Rico and established a new domicile in Texas before the filing of the instant lawsuit.  Id.

This appeal followed.

IV.

Though the issue of domicile is a mixed question of law and fact, we nevertheless review the district court's determination of the plaintiff's domicile for clear error.  See Meléndez-García v. Sánchez, 629 F.3d 25, 40-41 (1st Cir. 2010); Padilla-Mangual v. Pavía Hosp., 516 F.3d 29, 32 (1st Cir. 2008); Valentin v. Hosp. Bella Vista, 254 F.3d 358, 365 (1st Cir. 2001). This standard applies where, as here, the district court did not hold an evidentiary hearing but instead relied on a paper record. See Hawes v. Club Ecuestre El Comandante, 598 F.2d 698, 702 (1st Cir. 1979).  However, where the district court's result is based entirely on documentary evidence, "the presumption that the court reached a correct result is somewhat lessened relative to findings based on oral testimony."  Padilla-Mangual, 516 F.3d at 33-34 (citing Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 500 (1984) (noting that "the presumption of correctness that attaches to factual findings" of the district court "has lesser

force" where those "findings [are] based on documentary evidence" as opposed to "oral testimony")).

                                    V.

Federal courts have subject-matter jurisdiction over cases in which the amount in controversy exceeds $75,000 and where the parties are "citizens of different States."[2]  28 U.S.C. § 1332(a)(1).  Diversity must be complete -- "the presence of but one nondiverse party divests the district court of original jurisdiction over the entire action."  In re Olympic Mills Corp., 477 F.3d 1, 6 (1st Cir. 2007) (citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267 (1806)).  "For purposes of diversity, a person is a citizen of the state in which he is domiciled." Padilla-Mangual, 516 F.3d at 31.  "A person's domicile 'is the place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning.'"  Rodriguez-Diaz v. Sierra-Martinez, 853 F.2d 1027, 1029 (1st Cir. 1988) (quoting 13B C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3612, at 526 (2d ed. 1984)).  Proving domicile requires two showings: (1) "physical presence in a place," and (2) "the intent to make that place one's home."  Valentin, 254 F.3d at 366.  Necessarily then, domicile and

_____

[2]     For the purpose of § 1332, Puerto Rico is a "State[]." 28 U.S.C. § 1332(e); see also Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 32 (1st Cir. 2011).

                                  - 13 -

residence are not the same thing.  After it is established, a domicile "persists until a new one is acquired."  Id.

"Once challenged, the party invoking diversity jurisdiction must prove domicile by a preponderance of the evidence."  García Pérez v. Santaella, 364 F.3d 348, 350 (1st Cir. 2004).  There are a variety of factors that are relevant to determining a party's domicile: "current residence; voting registration and voting practices; location of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs and other associations; place of employment or business; driver's license and other automobile registration; [and] payment of taxes."  Id. at 351 (alteration in original) (quoting Wright, supra, § 3612). "No single factor is dispositive, and the analysis focuses not simply on the number of contacts with the purported domicile, but also on their substantive nature."  Id.

### VI.

We believe that the district court committed clear error.  In a nutshell, the evidence establishes that Aponte-Dávila was domiciled in Texas before his 2009 accident, that his stays in Puerto Rico while obtaining medical care needed in the aftermath of the accident were insufficient to effect a change of domicile from Texas to Puerto Rico, and that accordingly he was domiciled in Texas on the date his case was filed.

No one seriously disputes that Aponte-Dávila was domiciled in Texas before his accident. He first moved to Laredo, Texas, in 2004 and began working for Landstar. Though he left Texas in late 2004 to go to Puerto Rico, it is undisputed that the purpose of this relocation was to help his sick father with his business. There is nothing to suggest that this move was intended to be permanent. In fact, once his father's health improved in 2007, Aponte-Dávila returned to Laredo. He then obtained a loan from the First National Bank in Laredo to purchase a 2001 Freightliner Condo truck, and he spent the next two and a half years working out of Laredo for a trucking company called Land Carrier. In 2008, he obtained a Texas Class "A" commercial driver's license. Laredo was his base of operations during his tenure at Land Carrier. Moreover, for tax years 2007 to 2012, he filed all of his federal tax returns using his Texas address. As of the date of his accident, July 13, 2009, Aponte-Dávila was clearly domiciled in Texas.

Where the district court erred was in concluding that Aponte-Dávila had changed his domicile from Texas to Puerto Rico after his accident, as of the time he filed suit in Puerto Rico.

The bulk of the district court's justification for finding that Aponte-Dávila was domiciled in Puerto Rico is based on representations that Aponte-Dávila made about his residence in various forms including an application to participate in Puerto

Rico's "Reforma" health plan,[3] an application for Medicaid benefits, an application for a disability parking permit, a form submitted to the Puerto Rico Department of Treasury, and a form submitted to Warren Transport. He also obtained a Puerto Rico driver's license that listed an address in Caguas. The district court reasoned that "[s]trong evidence of domicile is found in representations a party has made on reports and documents submitted to third parties," and, citing a treatise, that "[a]lthough residence alone is not the equivalent of domicile, the place of residence is prima facie evidence of a party's domicile."[4] Dávila, 2015 WL 3889963, at *5.

_____

[3] The district court and the defendants add that the "Reforma" health plan is limited to residents of Puerto Rico. Dávila, 2015 WL 3889963, at *2, *5 n.3. Aponte-Dávila disagrees. The relevant statute provides: "All residents of Puerto Rico may be beneficiaries of the Health Plan established upon the implementation of this chapter, provided that they meet the following requirements . . . ." P.R. Laws Ann. tit. 24, § 7029. As Aponte-Dávila sees it, the statute does not expressly exclude non-residents. We need not resolve this dispute, though we question whether Aponte-Dávila is correct. For the purposes of our inquiry, it does not matter whether the plan is actually limited to residents or not -- residence is not the same as domicile. See Bank One, Tex., N.A. v. Montle, 964 F.2d 48, 53 (1st Cir. 1992). Rather, his participation in the plan is relevant to the extent that it demonstrates his intent, by claiming Puerto Rican residence, to make Puerto Rico his domicile.

[4] While this court has never expressly recognized such a principle, we note that other courts have. See, e.g., Krasnov v. Dinan, 465 F.2d 1298, 1300 (3d Cir. 1972); Walden v. Broce Constr. Co., 357 F.2d 242, 245 (10th Cir. 1966) (citing Stine v. Moore, 213 F.2d 446, 448 (5th Cir. 1954)). But see Mondragon v. Capital One Auto Fin., 736 F.3d 880, 886 (9th Cir. 2013) ("It does not appear that this circuit has yet adopted this presumption."). The

- 16 -

While the district court was certainly correct that residence is relevant to the question of domicile and that representations of one's residence in certain instances "are entitled to significant weight," Lundquist v. Precision Valley Aviation, Inc., 946 F.2d 8, 12-13 (1st Cir. 1991) (per curiam), the court erred by placing altogether too much emphasis on this factor in light of the circumstances. When considered in the context of Aponte-Dávila's reason for being in Puerto Rico in the first place -- medical treatment -- these representations about his residence, many tied to getting such treatment, do not themselves result in a change in domicile. See García Pérez, 364 F.3d at 351 (emphasizing that the court must consider the "substantive nature" of the party's contacts with the state).

Aponte-Dávila shuttled back and forth between Texas and Puerto Rico between 2009 and 2013 so that he could obtain medical care and assistance from his family as he attempted to recover from the injuries from his fall. The district court concluded

---

Supreme Court long ago stated that "[t]he place where a person lives is taken to be his domicil until facts adduced establish the contrary." Anderson v. Watt, 138 U.S. 694, 706 (1891) (emphasis added); see also District of Columbia v. Murphy, 314 U.S. 441, 455 (1941); Ennis v. Smith, 55 U.S. (14 How.) 400, 423 (1852) ("Where a person lives, is taken primâ facie to be his domicil, until other facts establish the contrary."). This principle, however, does not provide an end run around the longstanding test for domicile. Looking at residency alone is an insufficient analysis if there are other facts, and this court has consistently required a careful analysis of a variety of factors to determine a party's domicile. See Padilla-Mangual, 516 F.3d at 32; Bank One, 964 F.2d at 50.

that Aponte-Dávila "severed relevant links to Texas."  Dávila, 2015 WL 3889963, at *4.  But the record shows that he never stopped returning to Texas to work and that he continued to file his federal taxes from Texas.  He never filed tax returns in Puerto Rico.  When he was in Puerto Rico, he stayed with his parents or with his ex-wife, Báez.  After his last stay in Puerto Rico from May 2012 to April 2013, he returned to Texas where he renewed his Texas commercial driver's license, leased an apartment in Laredo, reactivated his bank accounts at Wells Fargo, and registered to vote in Texas.  While several of these actions occurred after the filing of the lawsuit, "subsequent events may bear on the sincerity of a professed intention to remain."  García Pérez, 364 F.3d at 351.  In this case, the actions that Aponte-Dávila took in Texas after filing his lawsuit are strong evidence that he never harbored an intention to change his domicile to Puerto Rico.

To be sure, Aponte-Dávila's connections to Texas were weakest in the period between the paralyzing incident in May 2012 and his return to Texas in April 2013.  At the same time, though, his connections to Puerto Rico during this period were not meaningfully stronger than they were before the May 2012 incident. The district court placed substantial weight on Aponte-Dávila's representations about his residency in Puerto Rico between 2009 and 2013.  Many of these representations were made before the May 2012 incident, when he maintained stronger ties to Texas.  After

- 18 -

the May 2012 incident, however, he continued to make the same types of representations.  So even if his ties to Texas were weaker after the May 2012 incident, his later, equivalent representations about his residency in Puerto Rico are insufficient to show that he thereafter intended to change his domicile.

"Jurisdictionally speaking, residency and citizenship are not interchangeable."  Valentin, 254 F.3d at 361 n.1. "[C]itizenship or domicile, not residence, is the basis of subject matter jurisdiction."  Bank One, Tex., N.A. v. Montle, 964 F.2d 48, 53 (1st Cir. 1992); see also Lundquist, 946 F.2d at 10 ("[T]he relevant standard is 'citizenship,' i.e., 'domicile,' not mere residence.").  Indeed, "[w]hile a person may have more than one residence, he can only have one domicile."  Bank One, 964 F.2d at 53.  This is why residence is not dispositive of the domicile inquiry but rather one of many factors that the federal courts consider when determining a party's domicile.  See García Pérez, 364 F.3d at 351.  Given the circumstances of Aponte-Dávila's ongoing medical treatment in Puerto Rico, the unremarkable fact that he claimed a residence in Puerto Rico and listed it on a variety of forms, several of which pertain directly to his medical condition and treatment, is weak evidence of an intent to remain in Puerto Rico indefinitely and give up his Texas domicile, particularly in light of his continued ties to Texas while he was recovering in Puerto Rico.

Our conclusion here is guided by our prior decision in Valentin. There, the plaintiff was a resident of Puerto Rico when she began experiencing severe abdominal pain. 254 F.3d at 361. Complications ensued as a result of surgery she received in Puerto Rico, and so she moved to Florida to "seek[] more sophisticated medical care." Id. While there, she stayed with her sister and brother-in-law. Id. She did not terminate her employment in Puerto Rico and instead used sick time donated to her by her co-workers and, when that ran out, unpaid leave. Id. at 361-62. She also left most of her belongings in Puerto Rico, kept her car registered there, and maintained a Puerto Rico bank account. Id. at 366. On the other hand, she obtained a Florida driver's license and a charge card from a Florida bank, and she even took a Florida nurse licensing exam and applied for nursing jobs. Id. at 366-67. On appeal, we affirmed the district court's determination that despite her contacts with Florida, the plaintiff remained a domiciliary of Puerto Rico. Id. at 367. We held that "bearing in mind that the plaintiffs [sic] primary purpose in going to Florida in April of 1998 -- to secure advanced medical treatment for the complications arising out of her surgery -- was fully consistent with transient status as opposed to outright relocation, we cannot say that the district court clearly erred in concluding that the plaintiff had not become a Florida citizen." Id.

Other cases from this circuit reinforce the importance of context in cases involving individuals who relocate for periods of time to a new jurisdiction for the purpose of obtaining medical treatment. In García Pérez, two parents brought a medical malpractice suit against a doctor and a hospital in Puerto Rico after three of their four quadruplets died around the time of their birth and the fourth suffered from a series of complications. 364 F.3d at 349. The family relocated to Florida to obtain medical care for the surviving daughter. Id. We reversed the district court's finding that the plaintiffs remained domiciled in Puerto Rico, concluding instead that they had established a new domicile in Florida. Id. at 355. This finding, however, was based on much more than mere residence in Florida. The parents maintained much stronger ties to Florida than Aponte-Dávila did to Puerto Rico. We noted that the parents had registered to vote in Florida, had acquired Florida driver's licenses, had sold their car in Puerto Rico and purchased two new cars in Florida, had rented out, but not sold, their house in Puerto Rico, and had opened a Miami bank account. Moreover, the father had studied for and passed the Florida bar exam and expressed a clear intention of practicing law in Florida. Id. at 352–53.

In Hawes, a husband and wife filed a tort claim against various defendants after the husband was rendered a quadriplegic when a horse jumped over a fence at a horse show the couple was

- 21 -

attending and struck the husband's back with its front legs. 598 F.2d at 699–700. At the time of the show, the pair lived in Puerto Rico, but they soon decided to move to New York so that the husband could seek treatment at a rehabilitation center there. Id. at 700. The couple took their personal belongings to New York, leaving their furniture in Puerto Rico with a friend. Id. The wife closed her Puerto Rico bank accounts and opened a new one in New York. Id. She also obtained a residence in New York. Id. The couple's younger daughter moved with them to New York and enrolled in school there, but the older one, an eighteen year old, stayed in Puerto Rico. Id. While the wife did not quit her job, she remained on leave without pay so that she could keep her accumulated retirement benefits. Id. Eventually, though, she obtained part-time employment in the suburbs of New York and then full-time employment in Manhattan. Id. at 702–03. She also filed federal income taxes from New York after the commencement of the tort action. Id. at 700. On these facts, which again implicated much more than just residence, the court concluded that "the plaintiffs clearly intended to move to New York City for as long as [the husband's] physical condition required," and that "they made a deliberate decision to go to New York City for an indefinite period of time." Id. at 702.

Because Valentin, García Pérez, and Hawes, like the case at hand, were before this court on clear error review, we cannot

-- and do not -- suggest that their outcomes are strictly determinative of this case. But they do illustrate the need to look beyond the facts regarding residence when faced with a party who relocates to a new jurisdiction for the purpose of seeking medical care. In the end, this case is most akin to the facts of Valentin, where the plaintiff had minimal contacts with the jurisdiction in which she sought medical care. Like Aponte-Dávila, the plaintiff in Valentin stayed with family while receiving medical care and obtained a local driver's license; she went even further than Aponte-Dávila and applied for jobs. Both she and Aponte-Dávila also maintained connections to their professions in their home jurisdictions. Aponte-Dávila's ties to Puerto Rico are quite superficial when compared to the parents in García Pérez. And while Hawes presents a closer case -- somewhere between Valentin and García Pérez -- the facts there strongly suggested an indefinite intention to stay in New York that simply is not present in this case in light of Aponte-Dávila's continued efforts to return to his work as an interstate truck driver in Texas.

The district court also erred when it concluded that a particular document submitted by Aponte-Dávila was "utterly incompatible" with the conclusion that he renewed his Texas commercial driver's license on May 6, 2013. Dávila, 2015 WL 3889963, at *3 n.2. The document at issue is a "Certified Abstract Record" from the Texas Department of Public Safety, dated October

14, 2013, which reflects relevant information pertaining to Aponte-Dávila's Texas commercial driver's license. The form states that a medical certificate was issued to Aponte-Dávila on May 6, 2013, by a Texas doctor. It also states that the "Date Last Issued" for Aponte-Dávila's commercial driver's license was September 30, 2013.

Aponte-Dávila argues that the Texas Department of Public Safety document shows that he renewed his Texas commercial driver's license -- or at least began the process of renewing it -- on May 6, 2013, which required him to receive a medical examination and certificate.[5]

---

[5] The defendants pressed at oral argument that Aponte-Dávila has waived any reliance on the Texas Department of Public Safety document to prove that he was in Texas on May 6 to obtain a medical certificate because the argument was not presented to the district court. Not so. The document was attached as Exhibit 11 to Aponte-Dávila's Motion in Support of Diversity Jurisdiction. In the motion itself, citing to Exhibit 11, he stated: "A week after arriving in Laredo, **on May 6, 2013**, Aponte renewed and was issued on that same date his Texas Commercial Driver's License . . . that had expired in February 2013 during his extended recuperation in Puerto Rico." While no express mention was made of the medical certificate, the relevance of the document was plainly apparent. Indeed, the district court was aware of the document's relevance to his presence in Texas, and addressed that point. See Dávila, 2015 WL 3889963, at *3 n.2.

The defendants also raise a series of evidentiary challenges to the Texas Department of Public Safety document. But these arguments were not presented to the district court. Unless a case involves "exceptional circumstances," we will not allow a party to raise a new issue on appeal that it did not raise to the district court. T I Fed. Credit Union v. DelBonis, 72 F.3d 921, 929–30 (1st Cir. 1995) (citing Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 628 (1st Cir. 1995)). Such circumstances

We think the district court's contrary conclusion is based on a misreading of the Texas Department of Public Safety document. It clearly states that the medical certificate was issued on May 6, 2013 by a Texas "Medical Examiner." Absent any evidence to the contrary, this document, along with Aponte-Dávila's deposition testimony and statements in his affidavit, could reasonably support the finding that Aponte-Dávila was in Texas and either renewed his license on May 6, or, at a minimum, began the process of renewal by obtaining the medical examination and certificate on that date. That the document says the "Date Last Issued" was September 30, 2013, does not, as the district court assumed, foreclose such a finding. Aponte-Dávila explained in his affidavit that he was issued a license on May 6, 2013, but that he was also reissued a new license on September 30, 2013, after he obtained a new address in Laredo. See Hawes, 598 F.2d at 704 (noting that where "the case was decided without a hearing," and the "facts set forth in the affidavit . . . are both reasonable and logical and do not contradict any statements made by [the plaintiff] . . . there could be no credibility determination made adverse to [the plaintiff]"). The Texas Department of Public Safety document is itself dated October 14, 2013, which would explain why the "Date Last Issued" was September 30, 2013.

---

are not present here, and so these evidentiary challenges are waived.

In the end, that Aponte-Dávila, within days of returning to Texas, renewed his commercial driver's license in order to return to his truck-driving career in Texas is evidence that he never intended to forego his Texas domicile in favor of Puerto Rico.[6]

We find that on the evidence presented, Aponte-Dávila has shown that he did not abandon his Texas domicile in favor of a Puerto Rico domicile after his accident in 2009, and that Texas necessarily remained his domicile until at least the date that his lawsuit was filed. See Valentin, 254 F.3d at 366 ("[A] party's former domicile persists until a new one is acquired."). We add, however, that even if we were to agree that Aponte-Dávila had shifted his domicile to Puerto Rico for the period during which he was seeking medical treatment, we believe that the district court erred in concluding that Aponte-Dávila had not reestablished Texas as his domicile before filing his complaint. Aponte-Dávila

---

[6] We also believe the district court erroneously disregarded the significance of Aponte-Dávila's license renewal. The district court appeared to equate Aponte-Dávila's commercial license with a noncommercial one, stating that "[o]btaining or renewing a driver's license is not necessarily a complicated procedure for one who (like plaintiff) already has the skill, and without more objective evidence of a domicile change is insufficient to tilt the balance to plaintiff's side." Dávila, 2015 WL 3889963, at *5 n.6. Aponte-Dávila's renewal of his commercial license, a more onerous task than renewing a noncommercial driver's license, is indicative of his intent to return to his longstanding career in Texas despite obtaining medical care in Puerto Rico.

returned to Texas, his prior domicile, and immediately took the significant step of renewing his commercial driver's license in order to resume his truck-driving career.  Shortly thereafter, he rented an apartment, reactivated his bank accounts, registered to vote, and voted in Texas.  Though events that happen after the filing of the complaint are "not part of the primary calculus," they still "bear on the sincerity of a professed intention to remain."  García Pérez, 364 F.3d at 351.

## VII.

The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.